*In re* CONTEMPT OF STONE

Docket No. 91189. Submitted July 3, 1986, at Detroit. Decided August 18, 1986. Leave to appeal denied, 426 Mich 854.

Certain grand jury subpoenas were served on Storer Communications, Inc., requiring the production of all written, filmed or recorded materials and notes relating to a news series on Detroit area teen street gangs done by Storer's employee, Bradley M. Stone, for Storer's television station. Bradley M. Stone appeared in the Wayne Circuit Court and admitted to having possession or control of the required materials but refusing to fully comply with the subpoena. The court, William J. Giovan, J., denied Storer's motion to quash the subpoenas, adjudged Stone to be in contempt and ordered him incarcerated. Storer appealed. The Court of Appeals first stayed enforcement, then set aside the stay. Storer applied for leave to appeal to the Supreme Court, which, in lieu of granting leave to appeal, remanded to the Court of Appeals with instructions to reinstate the order staying enforcement until release of the opinion of the Court of Appeals and to expedite the hearing and decision.

The Court of Appeals *held:*

1. Television news reporters do not come within the purview of the Michigan shield law, and construing the statute in that way does not deny television news reporters equal protection of the law.

2. The First Amendment does not give a reporter a privilege to refuse to reveal relevant information to a grand jury unless the grand jury is not being conducted in good faith, the information bears only a remote and tenuous relationship to the investigation, or there is no legitimate need of law enforcement for the information. The trial court did not err in refusing to quash the subpoena and in holding Stone in contempt.

Affirmed.

REFERENCES

Am Jur 2d, Constitutional Law §§ 735 *et seq.*

Am Jur 2d, Statutes §§ 142 *et seq.*

Am Jur 2d, Witnesses § 297.

Privilege of newsgatherer against disclosure of confidential sources or information. 899 ALR3d 37.

1. STATUTES — JUDICIAL CONSTRUCTION.

Ordinary words in a statute are to be given their plain and ordinary meaning and courts may not speculate beyond the words employed on the probable intent of the Legislature in determining the meaning of a statute; where the language of a statute is clear and unambiguous, judicial construction is neither required nor permitted.

2. CRIMINAL LAW — SHIELD LAW — WITNESSES — PRIVILEGE.

The statute making communications between reporters and their informants confidential applies only to reporters in the print media, not to television and radio reporters; the word "publication", employed in the statute, in its commonly understood sense means printed material for public dissemination (MCL 767.5a; MSA 28.945[1]).

3. CONSTITUTIONAL LAW — EQUAL PROTECTION.

Equal protection does not require that government choose between attacking every aspect of a problem or not attacking the problem at all.

4. CONSTITUTIONAL LAW — EQUAL PROTECTION.

The test of whether a government classification violates the constitutional guarantees of equal protection, absent a fundamental right or a suspect classification, is whether the classification has a rational basis, and the burden of proof is on the party attacking the classification's constitutionality.

5. CONSTITUTIONAL LAW — CRIMINAL LAW — WITNESSES — GRAND JURY — NEWSMEN.

Requiring a newsman to appear before a grand jury does not abridge the freedom of speech and the press guaranteed by the First Amendment, and the Constitution of the United States does not exempt a newsman from appearing before a grand jury and answering questions relevant to a criminal investigation.

6. CONSTITUTIONAL LAW — CRIMINAL LAW — WITNESSES — GRAND JURY — NEWSMEN — PRIVILEGE.

The First Amendment does not give a reporter a privilege to refuse to reveal relevant information to a grand jury unless the grand jury is not being conducted in good faith, the information bears only a remote and tenuous relationship to the investigation, or there is no legitimate need of law enforcement for the information.

*Frank J. Kelley*, Attorney General, *Louis J.*

*Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Timothy A. Baughman,* Chief of the Criminal Division, Research, Training and Appeals, and *Don W. Atkins,* Assistant Prosecuting Attorney, for the people.

*Dickinson, Wright, Moon, Van Dusen & Freeman* (by *Henry W. Saad* and *Zan M. Nicolli*), for Storer Communications, Inc.

Before: GRIBBS, P.J., and D. F. WALSH and BEASLEY, JJ.

GRIBBS, P.J. Respondent-appellant Storer Communications, Inc., appeals as of right from the Wayne Circuit Court's January 27, 1986, order denying Storer's motion to quash grand jury subpoenas and its March 18, 1986, order holding Storer's employee, television news reporter Bradley M. Stone, in contempt of court for failure to surrender confidential videotapes to a Wayne County citizens grand jury. We affirm.

Late in its term, the 1984-1985 Wayne County citizens grand jury began to investigate the shooting death of an off-duty Michigan state trooper. On August 29, 1985, Trooper Paul Hutchins and a female companion were accosted in Hart Plaza in downtown Detroit by two young males who announced a holdup. Trooper Hutchins' wallet was taken and he was shot and killed by one of the pair as he reached for his own weapon. The assailants escaped on foot.

On September 27, 1985, grand jury subpoenas were served on William Flynn, vice president and general manager of Channel 2, Storer's station, and on William Vance, Channel 2's news director, directing them to appear before the grand jury on October 3. The subpoenas demanded production of

all written, filmed or recorded materials and notes relating to a Channel 2 news series on Detroit area teen gangs, including all censored and edited portions and silhouette filmings related to or disclosing the identities of all persons who appeared in the news story and film. A motion to quash was filed. On October 21, the trial court heard arguments on that motion and, on November 25 and 26, the testimony of Michigan State Police Detective Sergeant Eric Humphrey and of Channel 2 reporter Bradley M. Stone was taken in a closed session. On January 27, 1986, in a lengthy, well-reasoned opinion, the trial court denied the motion to quash. On March 18, 1986, the trial court held Stone in contempt for failure to surrender the tapes to the grand jury in accordance with Grand Jury Subpoena No. 86-23.

On March 25, 1986, a panel of this Court granted a stay to Storer. On April 24, 1986, this Court set aside the stay.[1] On May 15, 1986, the Supreme Court, in lieu of granting leave to appeal, remanded the case to this Court with directions to reinstate the order staying enforcement of the contempt order until the date of release of our opinion and to expedite hearing of and decision in this case. On May 21, 1986, this Court issued an order staying enforcement of the contempt order until further order of this Court or until release of our opinion.

On appeal, we are faced with two issues. First, we must determine the reach of Michigan's "shield law," MCL 767.5a; MSA 28.945(1). Second, we must decide if a television news reporter has a common-law or constitutional privilege to withhold information sought by a grand jury.

---

[1] The order setting aside the stay was by a 2-1 vote. Judge BEAS-LEY's dissent was then followed by the Supreme Court in granting a stay.

Michigan's shield law, MCL 767.5a; MSA 28.945(1), is contained in the chapter of the Code of Criminal Procedure dealing with grand juries. It provides:

> *In any inquiry authorized by this act communications between reporters of newspapers or other publications and their informants are hereby declared to be privileged and confidential.* Any communications between attorneys and their clients, between clergymen and the members of their respective churches, and between physicians and their patients are hereby declared to be privileged and confidential when such communications were necessary to enable such attorneys, clergymen, or physicians to serve as such attorney, clergyman, or physician. [Emphasis added.]

The question presented in this appeal, which is one of first impression, is whether or not television news reporters come within the purview of that statute. We hold that they do not.

First, we note that the statute itself makes no mention of television or radio reporters. Rather, it refers to "reporters of newspapers or other publications." Appellant urges us to construe the statute broadly to read "publication" as including a television news show.

Courts may not speculate as to the probable intent of the Legislature beyond the words employed in a statute. Ordinary words are given their plain and ordinary meaning, *Winiecki v Wolf,* 147 Mich App 742, 744; 383 NW2d 119 (1985). When the language of a statute is clear and unambiguous, judicial construction is neither required nor permitted, *Attard v Adamczyk,* 141 Mich App 246, 250; 367 NW2d 75 (1985). Such a statute must be applied, and not interpreted, since it speaks for itself, *City of Lansing v Lansing Twp,* 356 Mich 641, 649; 97 NW2d 804 (1959); *Winiecki, supra.*

As the trial court noted, "publication" in its commonly understood sense means printed material for public dissemination. This conclusion is bolstered by the fact that the legislatures of other states have specifically referred to television and radio reporters. The State of Maryland amended its shield statute to include radio and television reporters in 1949, the year Michigan enacted its shield law. See *Tofani v State,* 297 Md 165, 169; 465 A2d 413 (1983). Michigan's shield law was amended in 1951, 1951 PA 276, and the grand jury statutes were amended in 1965, 1965 PA 251, and in 1970, 1970 PA 9. The Legislature could have included a reference to television and radio news reporters on those occasions, but it chose not to do so.

As the trial court noted, reading the statute to include television news reporters would be an inappropriate exercise of the judicial function, and arguments concerning the fairness of the statute must be addressed to the Legislature. The shield law is plain on its face and needs no construction. We conclude that the shield law applies only to the print media. See Humphrey, *Shield Statutes: A Changing Problem in Light of Branzburg,* 25 Wayne L Rev 1381, 1388 (1979) (Michigan's shield law "afford[s] a unique privilege to the *printed* press in that state" [emphasis added]).

Storer contends, however, that, if we give the statute its plain meaning, it violates the rights of broadcast journalists to equal protection of the law, US Const, Am XIV; Mich Const 1963, art 1, § 2. It urges us to construe the statute to avoid the asserted constitutional infirmity.

In *Fox v Employment Security Comm,* 379 Mich 579; 153 NW2d 644 (1967), the Supreme Court noted:

There is no doubt that State legislatures have a broad range of discretion in establishing classifications in the exercise of their powers of regulation. However, the constitutional guarantees of equal protection are interposed against discriminations that are entirely arbitrary. In determining what is within legislative discretion and what is arbitrary, regard must be had for the particular subject of the State legislation. There must be a relation between the classification and the purposes of the act in which it is found. [379 Mich 588. Citations omitted.]

When it creates a statutory distinction, the Legislature is not required to deal with every aspect of a particular problem at the same time, nor are the classifications which it creates required to be the perfect alternative with respect to solving the problem the Legislature is addressing, *Babbitt v Employers Ins of Wausau,* 136 Mich App 198, 200-201; 355 NW2d 635 (1984), lv den 419 Mich 962 (1984). A state may properly direct its legislation against what it deems an existing evil without covering the whole field of possible abuses. The statute should not be overthrown merely because other instances may be suggested to which it might also have been applied, *People's Appliance Inc v City of Flint,* 358 Mich 34, 45; 99 NW2d 522 (1959). Equal protection does not require that the Legislature choose between attacking every aspect of a problem or not attacking the problem at all. *Sutton v Cadillac Area Schools,* 117 Mich App 38, 43; 323 NW2d 582 (1982).

Absent a fundamental right or a suspect classification, a legislative classification does not violate equal protection guarantees if it has a rational basis, *Sutton, supra.* Where a fundamental right or suspect classification is involved, the "strict scrutiny-compelling state interest" test is used to de-

termine the validity of legislation. See *Sutton, supra,* p 42. In applying these tests, the challenged legislative judgment is accorded a presumption of constitutionality, *Babbitt, supra,* p 200. Fundamental interests include the right to vote and travel, due process in criminal matters, and specific guarantees in the bill of rights, *Anderson v Detroit,* 54 Mich App 496, 499, n 1; 221 NW2d 168 (1974), lv den 400 Mich 826 (1977).

Essentially, appellant's argument is that strict scrutiny applies to this statute because it deals with the fundamental right of freedom of the press. We disagree. In *Branzburg v Hayes,* 408 US 665; 92 S Ct 2646; 33 L Ed 2d 626 (1972), the United States Supreme Court held that requiring a newsman to appear before a state or federal grand jury does not abridge the freedom of speech and the press guaranteed by the First Amendment, and that the Constitution of the United States does not exempt a newsman from appearing before a grand jury and answering questions relevant to a criminal investigation. Thus, our interpretation of the shield law does not interfere with a fundamental right.

Consequently, the rational basis test is the correct framework for analysis of the shield law. The statute needs only a rational basis to be valid, and the burden of showing that the statute does not rest on a rational basis is on the litigant attacking the enactment, *Anderson, supra,* p 499. The statute must be upheld unless "it is so lacking in an adequate or reasonable basis as to preclude an assumption that legislative discretion was exercised," *Struble v DAIIE,* 86 Mich App 245, 253; 272 NW2d 617 (1978), lv den 406 Mich 885 (1979). The test of reasonableness is satisfied where any set of facts may reasonably be conceived to justify the legislative discrimination, *Morgan v Win Schu-*

*ler's Restaurant,* 64 Mich App 37, 42; 234 NW2d
885 (1975).

We believe that the Legislature could have rationally accorded a privilege to the print media and not to the broadcast media. Where there is any justification for the classification, we refrain from questioning the Legislature's wisdom in creating the classification scheme. The United States Supreme Court has concluded that the broadcast media and other media can be treated differently. See *Red Lion Broadcasting Co v Federal Communications Comm,* 395 US 367, 387; 89 S Ct 1794; 23 L Ed 2d 371 (1969). In our view, appellant has not met its burden of showing that the shield law did not rest on a rational basis, *People's Appliance, supra.*

Second, appellant argues that the lower court erred when it ruled that, under *Branzburg, supra,* the First Amendment does not protect Channel 2's reporter from compelled disclosure of his confidential work product in the circumstances of this case. We disagree.

In *Branzburg,* the United States Supreme Court held that requiring a newsman to appear and testify before a state or federal grand jury did not abridge the freedom of speech and press guaranteed by the First Amendment, *Branzburg, supra,* p 667. The Court declined to grant to newsmen a testimonial privilege not enjoyed by other citizens, and concluded that the grand jury plays an important, constitutionally mandated role in the process of fair and effective law enforcement, *Branzburg, supra,* p 690. The Court stated that, "[o]n the records now before us, we perceive no basis for holding that the public interest in law enforcement and in ensuring effective grand jury proceedings is insufficient to override the consequential, but uncertain, burden on news gathering that is

said to result from insisting that reporters, like other citizens, respond to relevant questions put to them in the course of a valid grand jury investigation or criminal trial," *Branzburg, supra,* pp 690-691. The Court noted that, "we cannot seriously entertain the notion that the First Amendment protects a newsman's agreement to conceal the criminal conduct of his source, or evidence thereof, on the theory that it is better to write about crime than to do something about it," *Branzburg, supra,* p 692.

The entire text of Justice Powell's concurring opinion reads as follows:

> I add this brief statement to emphasize what seems to me to be the limited nature of the Court's holding. The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safeguarding their sources. Certainly, we do not hold, as suggested in Mr. Justice Stewart's dissenting opinion, that state and federal authorities are free to "annex" the news media as "an investigative arm of government." The solicitude repeatedly shown by this Court for First Amendment freedoms should be sufficient assurance against any such effort, even if one seriously believed that the media—properly free and untrammeled in the fullest sense of these terms—were not able to protect themselves.

> As indicated in the concluding portion of the opinion, the Court states that no harassment of newsmen will be tolerated. *If a newsman believes that the grand jury investigation is not being conducted in good faith he is not without remedy. Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforce-*

*ment, he will have access to the court on a motion
to quash and an appropriate protective order may
be entered.* The asserted claim to privilege should
be judged on the facts by the striking of a proper
balance between freedom of the press and the
obligation of all citizens to give relevant testimony
with respect to criminal conduct. The balance of
these vital constitutional and societal interests on
a case-by-case basis accords with the tried and
traditional way of adjudicating such questions.

In short, the courts will be available to newsmen
under circumstances where legitimate First
Amendment interests require protection. [Emphasis added. 408 US 709-710.]

We think that, standing alone, *Branzburg* is
very clear. That case squarely rejected the notion
that the First Amendment gives a reporter a
privilege to refuse to reveal relevant information
to a grand jury, unless the grand jury is not being
conducted in good faith, the information bears
"only a remote and tenuous relationship to the
investigation," or there is no "legitimate need of
law enforcement" for the information.

After *Branzburg* was decided, however, courts
struggled with the opinion. As noted by one commentator:

The various opinions in *Branzburg* are less than
clear. Four Justices concluded that reporters could
be compelled to disclose their sources; four Justices said they could not be so compelled; and
Justice Powell took a middle position by allowing
compelled disclosure in some circumstances, but
not in others. *This left the lower courts to decide
on a case-by-case basis whether a privilege exists
in various situations extending beyond the facts of
Branzburg.* [Emphasis added. Newman, *qualified
privilege for journalists*—Branzburg v Hayes: *A
decade later,* 61 U Det JUL 463, 476 (1984).]

We believe that the approach of the majority in *Branzburg,* read along with Justice Powell's limitations as stated in his concurrence, correctly states the law as to a newsgatherer's privilege in the context of grand jury proceedings. As noted above, courts have had trouble with the opinion in situations extending beyond the facts of *Branzburg.* See *Developments in the law—Privileged communications,* 98 Harv L R 1450, 1604 (1985); Newman, *supra,* p 486. The facts of this case are not, however, distinguishable from those considered in *Branzburg.*

In criminal proceedings and in civil suits, some federal courts, using a balancing approach, have been willing to accord a privilege to newsgatherers more liberal than that found in *Branzburg.* See *United States v Cuthbertson,* 630 F2d 139 (CA 3, 1980); *United States v Cuthbertson,* 651 F2d 189 (CA 3, 1981); *Riley v City of Chester,* 612 F2d 708 (CA 3, 1979); *United States v Burke,* 700 F2d 70 (CA 2, 1983); *United States v Criden,* 633 F2d 346 (CA 3, 1980). See also *King v Photo Marketing Ass'n International,* 120 Mich App 527, 530-531; 327 NW2d 515 (1982). But see *In re Farber,* 78 NJ 259, 267-269; 394 A2d 330 (1978), cert den 439 US 997; 99 S Ct 598; 58 L Ed 2d 670 (1978).

However, in cases involving grand jury proceedings, courts have recognized that *Branzburg* is the controlling precedent. We need not balance the competing interests, because the Supreme Court has already done so. See *In re Grand Jury Matter, Gronowicz,* 764 F2d 983, 986 (CA 3, 1985), where the court required the government to show that the information sought was relevant to the investigation, properly within the jurisdiction of the grand jury, and not sought primarily for another purpose. See also *Tofani, supra;* 99 ALR3d 37, §§ 5-6, pp 53-60.

Thus, we hold that a reporter must divulge confidential information to a grand jury unless the grand jury is not being conducted in good faith, the relationship between the material sought and the object of the grand jury's investigation is remote and tenuous, or the investigation does not implicate a legitimate need of law enforcement.

In this case, the trial court found:

> First, it has not been suggested that the subpoena under consideration was issued other than in good faith. Second, the relationship between the material sought and the object of the grand jury's investigation is not remote and tenuous. By its quest for Channel 2's tapes the grand jury seeks to establish the very identity of persons guilty of Trooper Hutchins' homicide, and the information at hand, whether or not it eventually proves to be accurate, affords a reasonable basis to believe that the films can assist in that endeavor. And, finally, it cannot be claimed that establishing those identities is not a legitimate need of law enforcement.

We agree. The trial court did not err when it refused to quash the grand jury subpoena and held Stone in contempt.

Affirmed.