MARKETOS v AMERICAN EMPLOYERS INSURANCE COMPANY

Docket No. 112388. Submitted February 7, 1990, at Lansing. Decided August 22, 1990.

George J. Marketos and Mark Video Enterprises, Inc., brought an action in the Washtenaw Circuit Court, Ross W. Campbell, J., against American Employers Insurance Company after American denied a claim for insurance benefits relating to a business establishment owned by plaintiffs which was destroyed by a fire of suspicious origin. American asserted the defense of arson. American then served a subpoena duces tecum on Booth Newspapers, Inc., doing business as *The Ann Arbor News,* seeking production of photographs taken of the fire by Booth's photographer which were not published in the newspaper. Booth, while not claiming that the photographs were confidential, moved to quash claiming a qualified privilege protected it from producing the photographs gathered in the course of news reporting activities. The court denied the motion to quash and ordered Booth to produce the photographs. Booth appealed and has produced the photographs to American in accordance with a Court of Appeals order stating that such production would not render moot or otherwise prejudice Booth's appeal.

The Court of Appeals *held:*

1. A qualified privilege does not exist under the First Amendment of the United States Constitution or under Const 1963, art 1, § 5 to shield Booth from producing nonconfidential materials generated through its news gathering function. The obligation of all persons to give evidence necessary for the proper administration of justice is a fundamental civic duty applicable to both criminal and civil cases.

2. The civil rules of discovery grant trial courts broad discretion to issue protective orders to prevent the potential abuses feared by Booth.

3. Michigan's press shield law, as recently amended, MCL

REFERENCES

Am Jur 2d, Witnesses § 297.

Privilege of newsgatherer against disclosure of confidential sources or information. 99 ALR3d 37.

767.5a(1); MSA 28.945(1)(1), provides no protection for nonconfidential materials.

Affirmed.

SHEPHERD, J., dissented. He would hold that reporters do possess a qualified privilege against compelled disclosure to civil litigants of unpublished, nonconfidential information which was gathered in the course of the reporters' employment. He would hold that such information must be turned over to the litigant only where the litigant can demonstrate that the information goes to the heart of the case and that the litigant has exhausted all other means of obtaining the information. He believes that such an inquiry should take place only when a party is not able to present a prima facie showing of its case or defense without the disputed information. He would remand for a determination in this regard.

1. NEWSPAPERS — CONSTITUTIONAL LAW — NONCONFIDENTIAL MATERIALS.

A qualified privilege does not exist under the United States or Michigan Constitutions to shield a newspaper from producing nonconfidential materials generated through its news gathering function (US Const, Ams I and XIV; Const 1963, art 1, § 5).

2. EVIDENCE — OBLIGATION TO GIVE EVIDENCE — CRIMINAL LAW — CIVIL LAW.

The obligation of all persons to give evidence necessary for the proper administration of justice is a fundamental civic duty applicable to both criminal and civil cases.

3. NEWSPAPERS — PRESS SHIELD LAW — NONCONFIDENTIAL MATERIALS.

The Michigan press shield law provides a newspaper no protection for a request in a civil case for nonconfidential materials (MCL 767.5a[1]; MSA 28.945[1][1]).

*Kantner & Wieder* (by *Thomas F. Wieder*), for George Marketos and Mark Video Enterprises, Inc.

*Clausen, Miller, Gorman, Caffrey & Witous, P.C.* (by *Richard R. Winter, Michael L. Foran, William J. Schaefle* and *James T. Ferrini*), and *Miller, Canfield, Paddock & Stone* (by *Allyn D. Kantor*), for American Employers Insurance Company.

*Dykema Gossett* (by *E. Edward Hood* and *Jonathan D. Rowe*), for Booth Newspapers, Inc.

Before: WEAVER, P.J., and SHEPHERD and GRIF-
FIN, JJ.

GRIFFIN, J. Booth Newspapers, Inc., doing busi-
ness as *The Ann Arbor News,* appeals an order of
the Washtenaw Circuit Court which ordered Booth
to produce to American Employers Insurance Com-
pany unpublished, nonconfidential photographs
taken of a fire scene by a Booth photographer.
Booth argues that a qualified privilege exists un-
der the First Amendment of the United States
Constitution and under Const 1963, art 1, § 5 to
shield it from producing nonconfidential materials
generated through its news gathering function. We
disagree and decline the invitation to create such
a privilege for nonconfidential materials.

I

On January 4, 1986, a fire of suspicious origin
destroyed a business establishment located in the
City of Ann Arbor. A claim for insurance proceeds
was thereafter filed by the principal plaintiff,
George J. Marketos, against defendant, American
Employers Insurance Company. American denied
the claim and asserted, inter alia, the defense of
arson.

The fire marshal took some photographs of the
fire scene but concluded that the photos and inves-
tigation were inconclusive on the subject of arson.
The fire marshal accordingly was of the opinion
that the origin of the fire was "undetermined."

Appellant Booth also took photographs of the
fire scene, some of which were published in the
January 6, 1986, edition of *The Ann Arbor News.*
The approximately twenty other photographs that
were not published are the subject of the instant
appeal.

There is no dispute that the photographs were

taken at a public place in full public view. Confidentiality is not claimed.

Although Booth asserts that the twenty unpublished photographs are likely to duplicate the photos taken by the fire marshal, a detailed description of what the photographs depict has never been provided. American argues that, upon careful examination by their expert, the disputed photographs may reveal definitive evidence of arson.

On July 15, 1988, American served a subpoena duces tecum on Booth for production of the unpublished photographs. On August 11, 1988, Booth moved to quash the subpoena on the ground that a First Amendment qualified privilege protects it from producing unpublished nonconfidential materials gathered in the course of news reporting activities. Booth argued that the privilege should be absolute unless: (1) a compelling need for the photographs is demonstrated, and (2) substantially similar materials are unavailable through alternative sources. American countered by asserting that, unless the photographs are produced, it could not possibly meet the burden which Booth seeks to impose. American contended:

> Distilled to its essence, Booth's argument is a circular one: American cannot obtain the photos unless it proves they are critical to its case—but, because of the privilege, American cannot view the photos to determine their value.

Booth argued below and on appeal that unless a privilege is created for nonconfidential materials "subjecting the press to discovery as a nonparty would be widespread" and that "[t]he practical burdens on time and resources, as well as the consequent diversion of journalistic effort and disruption of newsgathering activity, would be particularly inimical to the vigor of a free press." [Quot-

ing with approval *O'Neill v Oakgrove Construction, Inc*, 71 NY2d 521, 526-527; 528 NYS2d 1, 3; 523 NE2d 277, 279 (1988).]

Washtenaw Circuit Judge Ross W. Campbell, in denying Booth's motion to quash, expressed regret that *The Ann Arbor News* had recently changed its longstanding policy of voluntarily providing unpublished photographs to anyone upon request for the nominal charge of $5 per photo:

> *The Court:* You know, *The News* has usually been pretty good about: you pay your dollar or five dollars and they'll let you have copies out their . . .
>
> *Mr. Rowe* [*attorney for Booth*]: The reason that *The News* has changed their policy, your Honor, is because . . .
>
> *The Court:* But this—I don't see—What are you protecting here? What's this—That seems sort of unreasonable. You're not protecting any reporter's confidential sources or anything.
>
> *Mr. Rowe:* Well, the reason that *The News* has changed its policy, your Honor, is the *O'Neill* versus *Oakgrove* case that I've cited in my motion.
>
> In that case, the New York Court of Appeals held, on the basis of the First Amendment to the United States Constitution, that a news agency has a right not to be subject to depositions and not to serve as a private news—information-gathering arm of private litigants. And *The News'* position is that if it starts disclosing photographs for five dollars, as your Honor's indicated, that it's essentially waiving its right and then it will be unable to stop a stream of requests from litigants, and particularly in situations like fires and criminal activity, *The News* is obviously going to be subject to a variety of requests of this nature. That's why they're taking the position they're taking.
>
> But I cited the . . .
>
> *The Court:* It used to be a friendly newspaper that tried to help out the rest of the community.

*Mr. Rowe:* Well, I think *The News* still thinks of itself as a friendly newspaper, your Honor.

*The Court:* But they're refusing to let them have copies of a few photographs . . .

*Mr. Rowe:* Well, that's right . . .

*The Court:* . . . even if they pay them for it.

*Mr. Rowe:* . . . because the lawyers involved are not seeking this for any reason other than to advance their cause in a litigation. They have access to other photographs from other sources. All they're doing is using *The News'* files; and if *The News* has to produce photographs to everybody who wants photographs, they're not going to be able to do their job as well and they aren't going to serve the community as well.

Judge Campbell was unimpressed with the New York authority relied upon and questioned the constitutional basis of a privilege to protect non-confidential materials. Additionally, the court agreed with American that the privilege advocated by Booth would be absolute for practical purposes because a litigant could not possibly establish a compelling need or the unavailability of other sources unless the photos at issue are examined and evaluated:

*The Court:* Well, how are they going to know that these photographs you have may not disclose material that they don't already have unless they take a look at them?

*Mr. Rowe*: Well, I suppose they don't know down to the detail of whether a particular person appears in the photograph, your Honor, but our photographer cannot have had any photographs more contemporaneous than the photographs taken by the fire marshal nor can he have had any better pictures after the fire than those taken by the insurance company.

*The Court:* All right. I think what you should do is to allow counsel for the defendant insurance

company to take a look at the photographs so that he can see if there's anything in them that commends itself as not being available in the other photographs so that he would be in a position to point out relevancy and compelling need. At the present time, I haven't got them in front of me. I can't tell what portion of them might exist over and above that disclosed in the fire marshal's photographs that would make it necessary to have *The News* giving copies.

An order was thereafter entered compelling the production of the photographs. A stay of the order was initially entered by this Court on June 13, 1989, but was later vacated by this Court on September 14, 1989, after the Michigan Supreme Court refused to grant an interlocutory appeal. 433 Mich 861 (1989). Booth has now produced the photographs to American in accordance with an order of this Court on May 18, 1989, which expressly states "[t]his order shall not render moot or otherwise prejudice appellant Booth's appeal."

Both parties concede that the issue is a matter of first impression in Michigan. The present case is the first in which any newspaper has requested the creation of a privilege to protect nonconfidential materials.

II

Ironically, Booth begins its argument by relying upon *Branzburg v Hayes,* 408 US 665; 92 S Ct 2646; 33 L Ed 2d 626 (1972). In *Branzburg,* the United States Supreme Court, in an opinion signed by five justices, refused to create a privilege for journalists to protect *confidential* sources:

Until now the only testimonial privilege for unofficial witnesses that is rooted in the Federal

Constitution is the Fifth Amendment privilege against compelled self-incrimination. We are asked to create another by interpreting the First Amendment to grant newsmen a testimonial privilege that other citizens do not enjoy. This we decline to do. [*Branzburg, supra* at 689-690].

The Supreme Court was not persuaded by the argument that the failure to create such a privilege would impede the ability of newspapers to gather and disseminate news:

We are admonished that refusal to provide a First Amendment reporter's privilege will undermine the freedom of the press to collect and disseminate news. But this is not the lesson history teaches us. As noted previously, the common law recognized no such privilege, and the constitutional argument was not even asserted until 1958. From the beginning of our country the press has operated without constitutional protection for press informants, and the press has flourished. [*Branzburg, supra* at 698-699.]

The petitioners in *Branzburg* had requested the establishment of the same "qualified" privilege for confidential sources sought in the instant appeal by Booth for nonconfidential materials. The United States Supreme Court, however, was unpersuaded and relied upon both criminal and civil cases in holding that no such qualified privilege exists:

It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability. Under prior cases, otherwise valid laws serving substantial public interest may be enforced against the press as against others, despite the possible burden that may be imposed. The Court has emphasized

that "[t]he publisher of a newspaper has no special immunity from the application of general laws." [*Branzburg, supra* at 682-683, citing *Associated Press v National Labor Relations Bd,* 301 US 103, 132-133; 57 S Ct 650; 81 L Ed 953 (1937).]

Booth relies heavily upon and reads much into Justice Powell's brief concurring opinion in *Branzburg.* Booth would have us create a journalist's privilege by combining Justice Powell's opinion with that of the dissenters. The opinion of the Court, however, was written not by Justice Powell but by Justice White. It was signed by five members of the Court, including Justice Powell, and accordingly serves as binding precedent.

We, like the United States Sixth Circuit Court of Appeals, view it inappropriate to "restructure" the holding of *Branzburg* by reading Justice Powell's concurrence into the dissenting opinion written by Justice Stewart:

> In contending that, as a news reporter, he was entitled to assert a "privilege grounded in the First Amendment," Stone would have us restructure the holding of the Supreme Court in *Branzburg v Hayes,* 408 US 665; 92 S Ct 2646; 33 L Ed 2d 626 (1972), since the majority opinion in that case rejected the existence of such a first amendment testimonial privilege:
>
> * * *
>
> Stone insists, however, that when his reading of Justice Powell's concurring opinion is superimposed upon Justice White's majority decision, the government is required to make "a clear and convincing showing of relevancy, essentiality, and exhaustion of non-media sources" for obtaining the information before he can be compelled to testify. In arguing that this amounts to a "qualified privilege," Stone relies heavily upon the dissenting opinion of three justices in *Branzburg,* and upon opinions from other circuit courts.

Because we conclude that acceptance of the position urged upon us by Stone would be tantamount to our substituting, as the holding of *Branzburg,* the dissent written by Justice Stewart (joined by Justices Brennan and Marshall) for the majority opinion, we must reject that position.

Justice White, writing for himself, Chief Justice Burger, and Justices Blackmun, Powell and Rehnquist, in addition to declining to recognize the existence of a first amendment reporter's "testimonial privilege that other citizens do not enjoy" [408 US at 690; 92 S Ct at 2661], specifically dealt with, and rejected, the claim that newsmen are entitled to a "conditional, not absolute" privilege—a testimonial privilege conditioned upon the inability of prosecutors to establish relevancy, unavailability from other sources, and a need so compelling as to override invasion of first amendment interests occasioned by the disclosure. 408 US at 680; 92 S Ct at 2656.

\*   \*   \*

Accordingly, we decline to join some other circuit courts, to the extent that they have stated their contrary belief that those predicates do exist, and have thereupon adopted the qualified privilege balancing process urged by three *Branzburg* dissenters and rejected by the majority. [*In re Grand Jury Proceedings,* 810 F2d 580, 583-584 (CA 6, 1987).][1]

Also see *Ex parte Grothe,* 687 SW2d 736, 738 (Tex Crim App, 1984), cert den 474 US 944 (1985).

---

[1] The Sixth Circuit Court of Appeals cited the following federal cases which have "restructured" the holding of *Branzburg: Zerilli v Smith,* 211 US App DC 116; 656 F2d 705 (1981); *United States v Burke,* 700 F2d 70 (CA 2, 1983), cert den 464 US 816; 104 S Ct 72; 78 L Ed 2d 85 (1983); *United States v Cuthbertson,* 630 F2d 139 (CA 3, 1980), cert den 454 US 1056; 102 S Ct 604; 70 L Ed 2d 594 (1981); *LaRouch v National Broadcasting Co,* 780 F2d 1134 (CA 4, 1986), cert den 479 US 818; 107 S Ct 79; 93 L Ed 2d 34 (1986); and *Miller v Transamerican Press, Inc,* 621 F2d 721 (CA 5, 1980), cert den 450 US 1041; 101 S Ct 1759; 68 L Ed 2d 238 (1981). Also see *Baker v F & F Investment,* 470 F2d 778 (CA 2, 1972), *Riley v City of Chester,* 612 F2d 708 (CA 3, 1979), and *In re Forbes Magazine,* 494 F Supp 780 (SD NY, 1980).

As the Sixth Circuit has explained, Justice Powell's concurring opinion is entirely consistent with the opinion of the Court and merely responds to the criticisms leveled by Justice Stewart in his dissent. Further, the "balancing of interests" referred to by Justice Powell is not a privilege but rather the longstanding requirement that subpoenas be issued in good faith and not for purposes of harassment:

> It is readily apparent, then, that Justice Powell's concurring opinion is entirely consistent with the majority opinion, and neither limits nor expands upon its holding, but that, instead, it responds to what Justice Powell perceived as an unwarranted characterization of that holding by Justice Stewart.
>
> . . . [T]his balancing of interests [referred to in Justice Powell's concurring opinion] should not then be elevated on the basis of semantical confusion, to the status of a first amendment constitutional privilege. Instead, courts should, as did the Michigan state courts, follow the admonition of the majority in *Branzburg* to make certain that the proper balance is struck between freedom of the press and the obligation of all citizens to give relevant testimony, by determining whether the reporter is being harrassed in order to disrupt his relationship with confidential news sources, whether the grand jury's investigation is being conducted in good faith, whether the information sought bears more than a remote and tenuous relationship to the subject of the investigation, and whether a legitimate law enforcement need will be served by forced disclosure of the confidential source relationship. [*In re Grand Jury Proceedings, supra* at 585-586.]

We note that later, in *Zurcher v Stanford Daily,* 436 US 547; 98 S Ct 1970; 56 L Ed 2d 525 (1978),

Justice Powell also signed the opinion of the Court but again wrote separately to criticize points raised in another dissenting opinion by Justice Stewart. In *Zurcher, supra,* the United States Supreme Court relied in part upon its previous decision in *Branzburg v Hayes* in holding that the First Amendment does not prohibit the execution of a search warrant against a newsroom to obtain evidence of third-party criminal activity. Further, the Supreme Court, as it did in *Branzburg,* rejected the argument that allowing such search warrants would destroy the abilities of newspapers to gather and disseminate the news:

> Nor are we convinced, any more than we were in *Branzburg v Hayes,* 408 US 665 [92 S Ct 2646; 33 L Ed 2d 626] (1972), that confidential sources will disappear and that the press will suppress news because of fears of warranted searches. Whatever incremental effect there may be in this regard if search warrants, as well as subpoenas, are permissible in proper circumstances, it does not make a constitutional difference in our judgment.
>
> The fact is that respondents and *amici* have pointed to only a very few instances in the entire United States since 1971 involving the issuance of warrants for searching newspaper premises. This reality hardly suggests abuse; and if abuse occurs, there will be time enough to deal with it. [*Zurcher, supra* at 566.]

III

On two previous occasions, our Court has addressed *Branzburg.* In *In re Contempt of Stone,* 154 Mich App 121; 397 NW2d 244 (1986), our Court dealt with the same case and litigant who subsequently sought habeas corpus relief from the Sixth Circuit Court of Appeals in *In re Grand Jury*

*Proceedings,* 810 F2d 580 (CA 6, 1987). We noted in *Stone* that because of Justice Powell's concurring opinion, some courts have struggled with the *Branzburg* holding:

> In criminal proceedings and in civil suits, some federal courts, using a balancing approach, have been willing to accord a privilege to newsgatherers more liberal than that found in *Branzburg.* [*In re Contempt of Stone, supra* at 132.]

We, however, refused to rewrite the holding of *Branzburg* and held that a television reporter was required to divulge confidential information to a grand jury:

> Thus, we hold that a reporter must divulge confidential information to a grand jury unless the grand jury is not being conducted in good faith, the relationship between the material sought and the object of the grand jury's investigation is remote and tenuous, or the investigation does not implicate a legitimate need of law enforcement. [*Id.* at 133.]

Previously, in *King v Photo Marketing Ass'n International,* 120 Mich App 527; 327 NW2d 515 (1982), a panel of this Court recognized a qualified privilege against compelled disclosures of *confidential sources* in a civil case:

> Reporters of general news are usually protected against compelled disclosure of confidential sources. *Branzburg v Hayes,* 408 US 665; 92 S Ct 2646; 33 L Ed 2d 626 (1972); *Riley v City of Chester,* 612 F2d 708 (CA 3, 1979); *United States v Cuthbertson,* 630 F2d 139 (CA 3, 1980). The so-called "news writer's privilege" is based upon the need to guarantee the unimpeded flow of information, comment, and opinion to the general public.

*Riley, supra,* p 715. However, this is a qualified
privilege which, under certain circumstances, may
have to yield to another party's need for the
information sought. *Cuthbertson, supra,* p 143.
[*King, supra* at 530-531.]

In holding that a qualified privilege exists as to
confidential sources, this Court developed the fol-
lowing two-tiered threshold:

We note that the trial court, in deciding the
applicability of a news writer's privilege, should be
guided by the requirements set forth in *Riley,
supra,* 612 F2d 708, 716, wherein the Court held
that a civil litigant seeking confidential informa-
tion should not be able to abrogate a news writer's
privilege absent a showing that: (1) the requested
information goes to the heart of the litigant's case;
and (2) the litigant has exhausted all other means
of obtaining the information. [*King, supra* at 532.]

Booth would have us expand *King* to nonconfi-
dential materials while American would have us
apply *In re Contempt of Stone.* However, neither
*In re Contempt of Stone* nor *King* is directly
applicable to the present case which involves *non-
confidential* materials in the context of *civil* litiga-
tion. Accordingly, we look to other jurisdictions.

IV

In *O'Neill v Oakgrove Const, Inc, supra,* the
New York Court of Appeals concluded that a
constitutional privilege was constitutionally man-
dated as to nonconfidential materials solely be-
cause of the perceived burden of time and re-
sources upon the press "that would inevitably
result from discovery without special restrictions":

The considerations underlying this *qualified*

privilege are not peculiar to materials obtained in confidence. [Citations omitted.] As many of the courts have already noted, confidentiality or the lack thereof has little, if anything, to do with the burdens on the time and resources of the press that would inevitably result from discovery without special restrictions. [Citations omitted.]

Although the Supreme Court has yet to recognize a reporter's privilege (see, e.g., *Branzburg v Hayes,* 408 US 665, 682-683 [92 S Ct 2646, 2657; 33 L Ed 2d 626 (1972)]; see, generally, discussion in Tribe, American Constitutional Law [2d ed]) § 12-22, at 971-977 and, indeed, declined to adopt the three-pronged test when requested to do so in the context of a grand jury investigation (see, *Branzburg v Hayes, supra* at 702-704 *id.,* at 710 [Powell, J., concurring]; compare with *id.,* at 740, 743, [Stewart, J., dissenting]), we agree with those Federal courts that have found the qualified privilege necessary to insure the protections guaranteed by the First Amendment. Moreover, "construing [our] own constitution so as to recognize a newsman's privilege," as the *Branzburg* court foresaw we might (408 US at 706, *supra*), we have no difficulty in concluding that the guarantee of a free press in article I, § 8 of the New York Constitution independently mandates the protection afforded by the qualified privilege to prevent undue diversion of journalistic effort and disruption of press functions. [*Oakgrove, supra* at 527-528.]

The New York Court of Appeals cited no evidence of the disruption of press functions or undue diversion of journalistic effort upon which it relied to create the constitutional privilege. Nevertheless, the New York Court of Appeals mandated a constitutional privilege as to unpublished photographs. Under the tripartite test created, discovery of nonconfidential material against a journalist may be ordered only if a litigant can demonstrate clearly and specifically that the items sought are:

(1) highly material, (2) critical to the litigant's claim, and (3) not otherwise available.

As American argues, the privilege created is in effect absolute since it is impossible for an adverse party to prove that the unseen materials are highly material, critical to the case, and not otherwise available without inspecting the unpublished materials.

Other courts that have grappled with the issue have done so with mixed results. In *Carroll Contracting, Inc v Edwards,* 528 So 2d 951 (Fla App, 1988), the Florida District Court of Appeals questioned whether any First Amendment privilege exists in a civil case to protect a newspaper from producing unpublished, nonconfidential photographs of an accident scene taken by an off-duty newspaper photographer. Without directly ruling on the question, the court upheld an order for the production of the nonconfidential photographs holding that the "duty of all persons to give evidence when called upon to do so" was controlling. *Carroll Contracting, Inc, supra* at 954, quoting with approval *People v Dupree,* 88 Misc 2d 791, 794; 388 NYS2d 1000, 1002 (1976). Cf. *Johnson v Bentley,* 457 So 2d 507 (Fla App, 1984), and *Tribune Co v Green,* 440 So 2d 484 (Fla App, 1983), rev den 447 So 2d 886 (1984).

In *Bartlett v Superior Court,* 150 Ariz 178; 722 P2d 346 (1986), the Arizona Court of Appeals refused to recognize in a civil case a qualified privilege under the First Amendment for an automobile accident scene videotape taken and broadcast by a television station.

Likewise, in *Alexander v Chicago Park Dist,* 548 F Supp 277 (ND Ill, 1982), the federal district court in a civil case rejected a claimed reporter's privilege for observations made by a reporter in a public place:

A reporter's observations of a public place or event are no different in kind than that of other individuals; and as to this, they are not entitled to constitutional protection. The provisions of the First Amendment simply do not extend to cover the reporter's observations of the parks during their investigation. [*Alexander, supra* at 278.]

Other courts have recognized a "qualified" privilege in criminal or civil cases by either misreading, restructuring, or ignoring the holding of *Branzburg.* See, e.g., cases cited in footnote number one.

## V

### A

#### FIRST AMENDMENT

After our extensive review, we are unpersuaded that a journalist's privilege as to nonconfidential materials is compelled by the First Amendment as applied to the states by the Fourteenth Amendment.[2]

We refuse to rewrite or restructure the holding of *Branzburg.* Were we to engage in such an exercise, we would violate our duty to follow our laws and constitutions as construed by higher courts. After recognizing the *Branzburg* holding of no First Amendment privilege as to *confidential* sources, it would be anomalous for us to establish a First Amendment privilege as to *nonconfidential* materials.

Moreover, the argument journalists have made that their very ability to gather news is dependent

[2] The First Amendment is applicable to the states through the due process clause of the Fourteenth Amendment. *Virginia State Bd of Pharmacy v Virginia Citizens Consumer Council, Inc,* 425 US 748, 749; 96 S Ct 1817; 48 L Ed 2d 346 (1976).

upon the right to protect the confidentiality of sources simply has no applicability in regard to the production of nonconfidential materials.

Although Booth would have us speculate that the administrative burden created by producing nonconfidential materials may some day grow to compete with, and ultimately consume, the journalist's time and resources essential to gathering and disseminating the news, we decline to engage in such speculation. In this regard, Booth relies upon a bald, self-serving conclusion which is totally unsupported by any documentary evidence or empirical data. Without evidence, we are left to guess as to what the administrative burdens have been in the past and are likely to be in the future.

Additionally, in the present case, we note that prior to *O'Neill v Oakgrove Const, Inc, supra,* it was the custom and practice of *The Ann Arbor News* to provide, upon request and payment of $5, unpublished, nonconfidential photographs taken by the newspaper's photographers. Booth has submitted no affidavits, depositions, or other documentary evidence to establish that its former practice was unduly burdensome or detrimental to its news operations. On the contrary, the assumption made below that Booth's prior practice was reasonable and not overly burdensome remains unrebutted.

The obligation of all persons to give evidence necessary for the proper administration of justice is a fundamental civic duty applicable to both criminal and civil cases. We decline to engage in a "balancing of interests" approach since we find no privilege as to nonconfidential materials. Furthermore, we reject Booth's insinuation that justice is somehow less important in civil cases.

While we refuse to recognize a constitutional privilege, we note that Booth is not without a remedy to protect it from harassment, oppression,

and undue burden or expense. Our civil rules of discovery grant the trial courts broad discretion to issue protective orders to prevent the potential abuses feared by Booth:

> (C) Protective Orders. On motion by a party or by the person from whom discovery is sought, and on reasonable notice and for good cause shown, the court in which the action is pending may issue any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following orders:
>
> (1) that the discovery not be had;
>
> (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place;
>
> (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery;
>
> (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters;
>
> (5) that discovery be conducted with no one present except persons designated by the court;
>
> (6) that a deposition, after being sealed, be opened only by order of the court;
>
> (7) that a deposition shall be taken only for the purpose of discovery and shall not be admissible in evidence except for the purpose of impeachment;
>
> (8) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way;
>
> (9) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.
>
> If the motion for a protective order is denied in whole or in part, the court may, on terms and conditions as are just, order that a party or person provide or permit discovery. The provisions of

MCR 2.313(A)(5) apply to the award of expenses incurred in relation to the motion. [MCR 2.302(C).]

When, and if, requests for civil discovery become overly burdensome and oppressive to journalists, we expect the trial courts in the exercise of their discretion to issue appropriate protective orders under the court rule.

### B

### MICHIGAN CONSTITUTION

Without citation of authority, Booth also asserts that a privilege is constitutionally mandated by the Michigan Constitution, Const 1963, art 1, § 5.[3]

Although the Michigan provision is phrased somewhat differently than its federal counterpart, we find nothing in the Michigan Constitution or its history which would lead us to conclude that its drafters intended to create a journalist's privilege as to nonconfidential materials. Furthermore, we note that at least as to First Amendment issues dealing with obscenity, our Supreme Court has held that the Michigan and United States constitutional guarantees are coextensive. See *People v Neumayer*, 405 Mich 341, 365; 275 NW2d 230 (1979).

### C

### MICHIGAN'S PRESS SHIELD LAW

Finally, we note that Michigan's press shield law as recently amended in response to *In re Contempt of Stone* provides no protection for non-

---

[3] Const 1963, art 1, § 5 states: "Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press."

confidential materials. The statute states in pertinent part the following:

> A reporter or other person who is involved in the gathering or preparation of news for broadcast or publicatioʻn shall not be required to disclose the identity of an informant, any unpublished information obtained from an informant, or any unpublished matter or documentation, in whatever manner recorded, relating to a communication with an informant, in any inquiry authorized by this act, except an inquiry for a crime punishable by imprisonment for life when it has been established that the information which is sought is essential to the purpose of the proceeding and that other available sources of the information have been exhausted. [MCL 767.5a(1); MSA 28.945(1)(1).]

Although the full gamut of press shield public policy arguments were debated by the Legislature in response to *In re Contempt of Stone*,[4] the Michigan press shield statute still applies only to the identities of informants and unpublished information or communications between a journalist and an informant. The Legislature has chosen not to protect nonconfidential materials.

In conclusion, the Michigan press shield law is inapplicable and provides no protection for a request in a civil case for nonconfidential materials. Furthermore, we are unpersuaded that a privilege as to nonconfidential materials is constitutionally compelled under either the First Amendment or the Michigan Constitution.

Affirmed.

WEAVER, P.J., concurred.

[4] See, e.g., House Legislative Analysis HB 5576, First Analysis (with committee amendment), May 27, 1986; Second Analysis, July 11, 1986; Third Analysis (as enrolled), January 15, 1987.

SHEPHERD, J. *(dissenting)*. I dissent and would hold that a newspaper has a qualified privilege to withhold nonconfidential information in civil litigation.

I begin the analysis with my view of *Branzburg v Hayes,* 408 US 665; 92 S Ct 2646; 33 L Ed 2d 626 (1972). While an initial reading of *Branzburg* might lead one to conclude that the Supreme Court found that the press does not possess a First Amendment privilege to refuse to respond to a grand jury subpoena under any circumstances, the concurring opinion of Justice Powell and an analysis of the dissenting opinions conveys an entirely different perspective on the case. Justice Powell, in his concurring opinion, would allow the press to oppose appearing before the grand jury if the subpoena were issued for purposes of harassment, if the reporter were called upon to give information "bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement." 408 US at 710. Justice Powell added: "The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." 408 US at 710.

A reading of the immediately preceding language cannot be interpreted to result in a five-justice majority for the proposition that there is no privilege of any kind for a reporter to challenge a subpoena before a grand jury investigating a criminal case. Indeed, when one looks at the dissenting

opinions, Justice Powell comes much closer to the rather brief opinion of Justices Stewart, Brennan and Marshall. Quite characteristically, Justice Douglas, in his dissenting opinion, took the position that the press has an absolute right not to appear before the grand jury. I must therefore respectfully disagree with my colleagues on this panel who conclude that *Branzburg* unqualifiedly denies the press any such privilege.

I must also emphasize that *Branzburg* was a case involving a subpoena of a reporter to appear before a grand jury investigating a criminal case. Whatever the holding in *Branzburg* might be, it does not apply to a subpoena issued by a private citizen in private litigation.[1] Indeed, distinguished commentators on *Branzburg* have said, "Left undecided was the scope of a newsman's privilege, if any, in testimony before administrative hearings, legislative hearings, and in civil suits." Nowak, Rotunda & Young, Constitutional Law (2d ed, 1983), ch 18, § VIII, p 911.

With regard to civil cases in general, the same commentators said at pp 913-914:

> Assertion of such a privilege in civil cases has met with a qualified success, the lower courts distinguishing *Branzburg* on the grounds that a civil action does not present as significant a countervailing interest as a criminal prosecution, particularly where the plaintiffs seeking access to a reporter's notes are not parties to a pending criminal action, but merely prospective witnesses. Thus,

---

[1] For this reason I need not comment extensively on *In re Contempt of Stone,* 154 Mich App 121; 397 NW2d 244 (1986), which also related to a grand jury subpoena. Contrary to defendant's assertion that *Stone* holds that *Branzburg* denies any claim of privilege to a reporter, *Stone* in fact holds that a reporter does not have a privilege "unless the grand jury is not being conducted in good faith, the information bears 'only a remote and tenuous relationship to the investigation,' or there is no 'legitimate need of law enforcement' for the information." 154 Mich App at 131.

in one district court case where the privilege has
been sustained, the standard required the party
seeking discovery to exhaust alternative sources
and to show that the information requested is
central to the party's claim.[22]

---

[22] *Democratic National Committee v McCord,* 356 F Supp
1394 (D DC, 1973).

---

I further believe that we must begin any analy-
sis of freedom of the press with the well-estab-
lished doctrine that freedom of speech, press and
religion have a preferred position in the hierarchy
of constitutional rights. See *Murdock v Pennsylva-
nia,* 319 US 105; 63 S Ct 870; 87 L Ed 1292 (1943).
To the extent that this preferred position applies
to the press, it relates only to interference with
press activity; it does not confer upon the press the
right to intrude upon areas where the general
public may not enter. For example, see *Booth
Newspapers, Inc v Midland Circuit Judge,* 145
Mich App 396; 377 NW2d 868 (1985). In *Booth
Newspapers* this Court would not permit a news-
paper to gain access to discovery documents which
the parties had agreed would not be admitted into
evidence. The instant case, however, does not in-
volve the press seeking to intrude upon private
rights (where the press stands no higher than
anyone else); it involves private litigants seeking
to intrude upon the operations of the press. The
trial judge in this case commented that at one
time appellant Booth Newspapers had been willing
to voluntarily release pictures it had taken if the
requesting party merely paid a fee. The trial judge
could not understand why the newspaper decided
to abandon this practice. In my view, if the news-
paper has a right not to release the pictures, its
prior willingness to do so on a voluntary basis
should not be converted into an absolute obliga-

tion. Either the press has the right to withhold the pictures or it does not. If the press has such a right, it must be free to exercise it whenever it chooses to do so.

This Court has already held that the press does have such a right with respect to confidential information. *King v Photo Marketing Ass'n, International,* 120 Mich App 527; 327 NW2d 515 (1982). Implicit in this Court's decision in *King* was a finding that the need to guarantee the unimpeded flow of information, comment and opinion to the general public outweighs a civil litigant's right to liberal discovery where the information sought is confidential. I believe that even where the information sought is not confidential significant First Amendment interests are implicated.

> The job of a newspaper is to gather as much information as it possibly can with respect to all facets of activity of interest and importance to readers. If it does its job well, it logically will be the repository of much information concerning controversial events which take place in the area which it serves. If the price of doing its job well, however, is to be a repeated role as the resource for those seeking information of only speculative value to themselves, coupled with a governmental command that they play that role, the effect will be severe. To make the press, in effect, the investigative arm of every civil litigant . . . inevitably will constrict the flow of information to the press, and ultimately to us all. [*In re Subpoena Duces Tecum to Stearns v Zulka,* 489 NE2d 146, 151 (Ind App, 1986), quoting *Suede Originals v Aetna Casualty,* 8 Media L Rptr 2565, 2566 (Tex Dist Ct, 1982).]

Allowing civil litigants unrestricted access to information gathered by the press which has not been published would disrupt reporters' news gath-

ering activities and divert time and resources from journalistic efforts. *O'Neill v Oakgrove Construction, Inc,* 71 NY2d 521; 528 NYS2d 1; 523 NE2d 277 (1988). I believe that such unrestricted access to the files of newspersons, who are not parties to the litigation, would unnecessarily burden the freedom of the press in carrying out their news gathering function. I therefore find that reporters do possess a qualified privilege against compelled disclosure to civil litigants of unpublished information which was gathered in the course of the reporters' employment. In addition to the comments in Nowak, Constitutional Law, *supra,* I note that several other state and federal courts have found the reporter's privilege to extend to information which is not confidential. *O'Neill, supra; Zulka, supra; Johnson v Bentley,* 457 So 2d 507 (Fla App, 1984); *In re Consumers Union of United States, Inc,* 495 F Supp 582, 586 (SD NY, 1980); *Loadholtz v Fields,* 389 F Supp 1299 (MD Fla, 1975); *Altemose Construction Co v Building & Construction Trades Council of Philadelphia,* 443 F Supp 489 (ED Pa, 1977).

I must stress that the reporter's privilege is not absolute. Where a civil litigant can demonstrate that the requested information goes to the heart of the case and that the litigant has exhausted all other means of obtaining the information, the information must be turned over to the litigant. *King, supra.* On the record before us I cannot determine whether appellee can meet these requirements. I therefore would remand this case to the trial court. If it is true, as alleged by appellant, that other photographs of the scene were taken by the fire marshal at the same time as appellant's photographs were taken, such evidence

would weigh heavily in favor of a finding that there are other means of obtaining the information.

Still to be decided is the question of when a trial court must conduct an inquiry into whether the information must be released. I would conclude that to protect the rights of the press as I have interpreted them, such an inquiry should take place only when a party is not able to present a prima facie showing of its case or defense without the disputed information. At that point, there would be justification in saying that the balance shifts in favor of the private litigant so that the trial court should then inquire whether the information goes to the heart of the case and whether the litigant has exhausted all other means of obtaining the information. If my view of this case ultimately prevails I would have the trial judge make a three-step inquiry:

1. Can the defendant establish a prima facie showing of arson with the information it has already obtained after conducting discovery? If the answer to this question is in the affirmative, there is no need to proceed further.

2. If the answer is in the negative, the trial court should then determine whether the pictures go to the heart of defendant's case, i.e., are they a part of the elements of the defense or merely peripheral?

3. Has defendant exhausted all other means of obtaining the requested information?

Since the pictures in this case have already been turned over to defendant, I would make their admissibility at trial contingent upon the answers to the above questions being adverse to Booth's position.