THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GEORGE GREGORY KORKALA, Also Known as GARY KORKALA, and FRANK TERPIL, Defendants, and CBS, INC., Appellant.

First Department, February 14, 1984

APPEARANCES OF COUNSEL

*Eugene L. Girden* of counsel (*Harold R. Tyler, Jr., Marjorie T. Coleman* and *Leslie C. Levin* with him on the brief; *Patterson, Belknap, Webb & Tyler,* attorneys), for appellant.

*Mark Dwyer* of counsel (*Robert M. Pitler* and *Matthew T. Crosson* with him on the brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

OPINION OF THE COURT

*Per Curiam.*

In preparation for the retrial of the defendant George Gregory Korkala on charges of allegedly selling and conspiring to sell arms and explosives to supposed South

American terrorists, the District Attorney of New York County issued a subpoena duces tecum to CBS, Inc., for the production of video and audio tapes, including "outtakes"[1] of conversations with and interviews of Korkala and his cohort Frank Terpil conducted by Mike Wallace, a CBS news correspondent in Beirut, Lebanon, in November, 1981.

CBS moved to quash the subpoena, contending that the unpublished materials were protected from disclosure by a "qualified privilege" deriving from the First Amendment to the United States Constitution and also were protected by an "absolute privilege" under the New York Shield Law (Civil Rights Law, § 79-h). Trial Term rejected both the constitutional and Shield Law arguments and denied the motion to quash (121 Misc 2d 291). We agree with Trial Term's determination as to the applicable legal principles. Nevertheless we deem it appropriate to modify the order to the extent indicated herein.

In an indictment filed in January, 1980, George Gregory Korkala and Frank Terpil were charged with selling and conspiring to sell arms and explosives to persons they believed to be South American terrorists, but who were, in fact, New York City police officers posing as terrorists. Korkala and Terpil fled the country before they could be brought to trial on these charges. Following a determination by the court that they had voluntarily absented themselves, they were tried *in absentia* and convicted of the charges. In 1981, while still·fugitives and living in a safe haven in Beirut, Lebanon, Korkala and Terpil gave an extensive interview to Mike Wallace for broadcast on the "60 Minutes" television program. In that interview, they are said to have freely discussed the criminal charges pending against them and the circumstances of their involvement with the supposed "terrorists". Portions of that interview were broadcast on November 8, 1981, on the "60 Minutes" program in a segment entitled: "Wanted, Terpil and Korkala". That segment was rebroadcast in a shortened version on June 20, 1982.

---

1. "Outtakes" are those portions of the tapes that were not broadcast or otherwise disseminated.

Korkala was subsequently apprehended in Spain and ultimately returned to this jurisdiction under an agreement whereby the prior conviction would be vacated and a new trial had on the 1980 indictment. In pretrial proceedings, Korkala has indicated that he intends to raise as a defense the claim that he believed the transaction in which he participated with the supposed "terrorists" was authorized by the Federal Bureau of Investigation, the Central Intelligence Agency and/or some other governmental agency or agencies. He has indicated that he will attempt to prove that he had dealings with various governmental agencies both before and after the transaction upon which the indictment is based.

The People contend that since Korkala freely discussed the transactions which are the subject matter of this indictment with Mike Wallace during the interview which lasted several hours, but only 22 minutes of which were broadcast, they should be provided with the full interview so that should Korkala testify at his retrial as he has indicated he would, any testimony he may give in his defense that varies from statements he made during the interview can be challenged and Korkala impeached thereby. Additionally, the People argue that should any of the admissions he made during the broadcast portion of the interview be challenged when offered at trial as being "out of context", the full interview should be available to provide the "context", and thus refute that challenge; that the video and audio tapes contain admissions by Korkala which amount to confessions of his crimes and evidence that will rebut his proposed defense and that the broadcast portions of the interview and the summaries by Wallace, make clear that the discussion of the matters which are the subject of the indictment continues for quite sometime in the "outtakes".

In response to CBS's claim of an "absolute privilege" afforded by the Shield Law, the People point out that Korkala and Terpil were paid for their interview, and knew that all or part of it, as determined in CBS's sole discretion, would be broadcast. Thus the expectation of confidentiality said to be required in order to invoke the Shield Law is missing. CBS contends, on the other hand,

that the People already have that portion of the interview that was broadcast and that as to the unbroadcast material there has not been a showing of materiality, relevance or necessity sufficient to override the immunity from disclosure they enjoy under the freedom of the press guarantee of the First Amendment; that any required production of the unbroadcast material would have a "chilling effect" on their ability to freely gather and disseminate "news". Thus, they argue, under the "balancing test" developed by the courts in respect to the fair trial-free press conflict, the subpoena should be quashed. In any event, argues CBS, the 1981 amendment to section 79-h of the New York Civil Rights Law evinces a legislative intent to "close the loopholes" engrafted on the statute by judicial interpretation, including the requirement that the information sought must have been acquired under a "cloak of confidentiality". The amended statute, they say, creates an "absolute privilege" against the enforced disclosure of "any news or the source of any such news coming into [a professional journalist or newscaster's] possession in the course of gathering or obtaining news for publication" (Civil Rights Law, § 79-h, subd [b]).

CBS bottoms its legislative intent argument upon the statement of Assemblyman Steven Sanders, an early sponsor of the proposed 1981 amendments, that the purpose of the legislation was to "correct loopholes and fill gaps in the existing statute" by guaranteeing "absolute coverage" to newsmen. (NY Legis Ann, 1981, pp 257-258.) They find support for this argument in the decisions of two trial courts (*People v Iannaccone*, 112 Misc 2d 1057;[2] *Wilkins v Kalla*, 118 Misc 2d 34), both of which hold that the 1981 amendments confer an absolute privilege against compelled disclosure of "any news" by doing "away with the 'cloak of confidentiality' requirement" (*People v Iannaccone, supra*, at p 1061) and making it clear "that its protection extends not only to confidential sources, but also to all unpublished information." (*Wilkins v Kalla, supra*, at p 36.)

---

**2.** This court's affirmance of *People v Iannaccone* (96 AD2d 488) was without opinion and was addressed to the criminal conviction and not the motion to quash the subpoena. Reliance upon that affirmance as an expression by this court as to the impact of the 1981 amendments to section 79-h of the Civil Rights Law, upon the "cloak of confidentiality" requirement would be misplaced.

There can be no doubt that prior to the 1981 amendments to section 79-h of the Civil Rights Law, the thrust of the New York Shield Law was deemed by our courts to be aimed at encouraging a free press by shielding from compelled disclosure those communications, and their source, that were obtained by the news media in confidence during the course of news gathering. The cases uniformly held that in order for a communication or its source to be shielded from disclosure it must be shown that the information was imparted to the newsman under a cloak of confidentiality upon an understanding, either express or implied, that either the information or its sources, or both, would not be revealed. (*Matter of WBAI-FM,* 68 Misc 2d 355, affd *sub nom. Matter of WBAI-FM v Proskin,* 42 AD2d 5; *Matter of Wolf v People,* 69 Misc 2d 256, affd 39 AD2d 864; *Matter of Andrews v Andreoli,* 92 Misc 2d 410.) Where the information had not been received under a recognizable cloak of confidentiality however, no privilege against disclosure of either the material or the source attached. (*Matter of Andrews v Andreoli, supra.*)

Obviously there was no understanding or expectation here of confidentiality in respect to the Korkala/Terpil interview. Indeed, the clear expectation was that the interview would be broadcast on the "60 Minutes" program thus exposing both the material and its source. Under the settled pre-1981 interpretation of section 79-h, no privilege shields the unbroadcast material, these "outtakes", from production. Unless the 1981 amendments have created an "absolute privilege", as asserted by CBS, Trial Term was correct in denying the motion to quash on Shield Law grounds. We hold that no "absolute privilege" was created by those amendments.

Assemblyman Sanders' intention to "correct loopholes and fill gaps" in respect to section 79-h of the Civil Rights Law, apparently did not survive the legislative process, since only 2 of the 12 "notwithstanding" provisions contained in the initial version of the bill (S 3553/A 4547) were finally enacted by the Legislature (S 3553-B/A 4547-B). Indeed, the very provision contained in the initial version of the bill that would have eliminated the "cloak of confidentiality" requirement for invoking the Shield Law was

deleted from the version finally passed. That development rather persuasively suggests that the Legislature's intent, as opposed to that of an individual member, was not to create an "absolute privilege" against disclosure. We note that the number of cosponsors of the final bill is considerably greater than the number of cosponsors of the initial bill, a fact that may well be illuminating as to the "legislative intent".

Although such deletion does not conclusively establish the intent of the Legislature, as the court below appropriately noted, such rejection of a specific statutory provision is a significant consideration when divining legislative intent. Our conclusion is given added force by the rule that the intention to change a long-established rule or principle is not to be imputed to the legislature in the absence of a clear manifestation (*Hammelburger v Foursome Inn Corp.*, 54 NY2d 580, 582, citing *Matter of Delmar Box Co.* [*Aetna Ins. Co.*], 309 NY 60) and while pre-enactment statements properly may be taken into consideration (*Civil Serv. Employees Assn. v County of Oneida*, 78 AD2d 1004) they are but one of such factors to be considered and are by no means conclusive.

Notably, the Fourth Department reaffirmed the "cloak of confidentiality" requirement in connection with a claimed Shield Law privilege and observed, in a case decided in December, 1981, that "such privilege may be invoked only after there has been established an express or implied agreement of confidentiality" (*Hennigan v Buffalo Courier Express Co.*, 85 AD2d 924; see, also, *Oak Beach Inn Corp. v Babylon Beacon*, 92 AD2d 102).

Turning then to a consideration of the First Amendment arguments, we agree with Trial Term that, in the circumstances of this case, at this stage of the proceeding, there do not appear to be such compelling constitutional concerns as would warrant quashing the subpoena.

Nevertheless, we are mindful of the fact that there is the qualified privilege accorded to the newsman which is founded directly upon the free speech, free press guarantees of the First Amendment and that compelling disclosure of information obtained by a reporter in news gathering can have a " 'chilling effect' upon his functioning as a

reporter and upon the flow of information to the general public" (see *Loadholtz v Fields,* 389 F Supp 1299, 1300). And this is so even though the "source" of the sought-after material is already known. In *Loadholtz v Fields* (*supra,* p 1303), the court ruled that even though no confidential source issue was involved, that fact "is utterly irrelevant to the 'chilling effect' that the enforcement of these subpoenas would have on the flow of information to the press and to the public. The compelled production of a reporter's re-source material is equally as invidious as the compelled disclosure of his confidential informants." (See, also, *United States v Cuthbertson,* 630 F2d 139, cert den *sub nom. Cuthbertson v CBS, Inc.,* 449 US 1126; *People v Bova,* 118 Misc 2d 14.)

In judging a claimed privilege against compelled disclo-sure, there must be a "striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal inter-ests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." (*Branz-burg v Hayes,* 408 US 665, 710.) Thus, there has evolved a three-pronged "balancing test", applicable to both civil and criminal cases (see *Gulliver's Periodicals v Levy Circulat-ing Co.,* 455 F Supp 1197; *United States v Burke,* 700 F2d 70), that is employed by the courts in evaluating a claimed First Amendment news reporter's privilege against com-pelled disclosure of his material or its source. In *Burke* (*supra,* pp 76-77), the United States Court of Appeals for the Second Circuit held that " 'to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources' ".

The People's claimed need for the "outtakes" appears to be for potential use on cross-examination to impeach Kor-kala, to rebut a prospective defense through admissions Korkala made during the course of the interview and to have available the "context" in which these admissions

and other statements were made in order to meet a charge that the statements and admissions presented were taken "out of context".

Although it seems clear that the unbroadcast material is "relevant" to the subject of the prosecution and that these materials are not obtainable from any other source, it is by no means clear from this record that their production is "necessary" to the Korkala prosecution, even for impeachment or rebuttal purposes.

The trial has not yet commenced, and although Korkala has indicated that his defense will take a particular tack, whether or not it will do so in fact, remains to be seen. We conclude, therefore, that the subpoenaed unbroadcast material should be delivered to the Trial Judge for his *in camera* inspection and determination as to whether there exists any necessity for its being made available to the People in respect to any defense proffered by Korkala. Should it be determined that such necessity exists or develops, then the material shall be turned over to the People.

Accordingly, order of the Supreme Court, New York County (THOMAS B. GALLIGAN, J.), dated September 15, 1983, which denied the motion by CBS, Inc., to quash a subpoena duces tecum issued by the District Attorney of New York County for the production of video and audio tapes, including "outtakes" of conversations and interviews of George Korkala and Frank Terpil, conducted in or about October or November, 1981, in Beirut, Lebanon, portions of which were broadcast by CBS Television network on the program "60 Minutes" on Sunday, November 8, 1981, is unanimously modified, without costs, on the law, facts and in the exercise of discretion, to direct that the subpoenaed material be delivered to the trial court for an *in camera* examination by the court and a determination as to the necessity for use of any of such material in respect to any defense in fact offered by the defendant during the course of the trial, and otherwise affirmed.

KUPFERMAN, J. P., SANDLER, ASCH, BLOOM and ALEXANDER, JJ., concur.

Order, Supreme Court, New York County, entered on September 15, 1983, unanimously modified, on the law,

facts and in the exercise of discretion, without costs and without disbursements, to direct that the subpoenaed material be delivered to the trial court for an *in camera* examination by the court and a determination as to the necessity for use of any of such material in respect to any defense in fact offered by the defendant during the course of the trial, and otherwise affirmed.