**COMPUWARE CORPORATION,**
Plaintiff,

v.

**MOODY'S INVESTORS SERVICES,
INC., Defendant.**

No. 03–70247.

United States District Court,
E.D. Michigan,
Southern Division.

June 10, 2004.

Michael J. Barton, Anthony J. Rusciano, Bloomfield Hills, MI, for Plaintiff.

Thomas F. Cavalier, Detroit, MI, James J. Coster, Saterlee, Stephens, New York, NY, Scott T. Seabolt, Detroit, MI, for Defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

Plaintiff Compuware Corporation ("Compuware") moves to compel Defendant Moody's Investor's Services ("Moody's") to produce documents in accordance with six requests. Defendant Moody's moves to compel documents in accordance with requests dealing with four main topics. Intervenor Computer Associates, Inc. ("Computer Associates") opposes Plaintiff Compuware's motion to compel Moody's to disclose documents pertaining to Intervenor Computer Associates. As discussed below, both motions to compel are granted in part and denied in part, and in addition, Plaintiff's motion to compel is held in abeyance in part pending production of *in camera* materials that will assist this Court in deciding remaining issues of privilege.

## FACTUAL BACKGROUND

Plaintiff contracted with Defendant to publish a credit rating of Compuware, for which it paid approximately $245,000. Plaintiff argues the senior unsecured debt rating that Defendant issued on 13 August 2002, which downgraded Compuware's rating, was fundamentally flawed to Plaintiff's detriment because the rating ignored and/or misrepresented key information about Plaintiff's financial condition and therefore the trustworthiness of Plaintiff's public financial statements. Plaintiff has two claims pending against Defendant: a breach of contract claim and a defamation claim.

Plaintiff's motion regards six document requests (Nos. 1 and 6–10). Request One requests all documents for the last five years that discussed or referred to credit ratings of Plaintiff Compuware, Intervenor Computer Associates, and International Business Machines ("IBM"). Computer Associates, a competitor of Plaintiff's, was mentioned in the 13 August 2002 rating as a source of competitive pressure for Compuware. The rating also discussed Compuware's "strained" business relationship with IBM. Requests Six through Eight regard further IBM materials, including all communications in the last five years between Moody's and IBM, contractual agreements between IBM and Moody's, and invoices from Moody's to IBM. Request Nine seeks the identities of any individuals who have worked on the ratings of Compuware, Computer Associates, or IBM in the last five years. Request Ten seeks complete personnel files for four Moody's analysts.

Defendant moves to compel Plaintiff to turn over documents that address four subjects: (1) Compuware's financial obligations during the relevant time period; (2) the accuracy and preparation of Compuware's public financial statements; (3) Compuware's financial condition and financial outlook during the relevant period; and (4) the impact of Compuware on its relationship with IBM.

## ANALYSIS

Fed. R. of Civ. P. 26(b)(1) generally allows discovery as long as the matter is (1) relevant to the claim or defense of any party; and (2) not privileged, subject to some judicially-determined limitations. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. Since the relevance of the materials sought depends on the nature of the actions before this Court, I will briefly summarize the elements of Plaintiff's two claims. I will then analyze the relevance of the materials sought by Plaintiff, Defendant's claims of privilege for the relevant materials, and all other considerations as to the discovery requested by Plaintiff. I will then turn to Defendant's motion to compel before summarizing my holdings and specifying the further information I require from Defendant to complete my decisions on Plaintiff's motion.

### I.  Elements of Plaintiff's Claims

### A.  Defamation

■■■ The elements of defamation under Michigan law are as follows: (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statements irrespective of special harm, or the existence of special harm caused by the publication. *See, e.g., Gonyea v. Motor Parts Federal Credit Union*, 192 Mich.App. 74, 480 N.W.2d 297 (1991); *Rouch v. Enquirer & News of Battle Creek, Michigan*, 440 Mich. 238, 487 N.W.2d 205 (1992). Because Plaintiff is a public fig-

ure, the First Amendment rights of Defendant require a more stringent standard for the third element: Plaintiff must demonstrate that the alleged defamatory statements were made with actual malice, which is defined as either making the statement with knowledge of its falsity or in reckless disregard of the truth. *New York Times v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Hustler Magazine v. Falwell*, 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). Liability can lie even for a statement of opinion made with actual malice, if the statement reasonably implies false and defamatory facts. *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

### B.  Breach of Contract

■■■ Under Michigan contract law, there is an implied covenant to perform in a competent, skillful and workmanlike manner and in good faith. *Nash v. Sears, Roebuck & Co.*, 383 Mich. 136, 142–44, 174 N.W.2d., 818, 821–822; *Burkhardt v. City National Bank of Detroit*, 57 Mich.App. 649, 652, 226 N.W.2d 678 (1975). However, because this contract deals solely with the publication of financial information and Defendant's opinion about Plaintiff, First Amendment considerations arise. The Supreme Court has chosen to apply First Amendment protections in cases beyond the traditional libel, slander, and defamation causes of action. *See, e.g., Bose v. Consumers Union*, 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (product disparagement action). In a case against a financial publisher, the U.S. District Court for the Central District of California found the breach of contract claim warranted heightened First Amendment protection and therefore applied the actual malice standard to the breach of contract claim. *County of Orange v. McGraw Hill Companies, Inc.*, 245 B.R. 151, 154 (C.D.Cal.1999). I find this precedent persuasive. Therefore, in order to prevail on the breach of contract claim, Plaintiff must show that Defendant acted with actual malice or reckless disregard of the truth while performing the contracted-for services.[1]

---

1.  Because Plaintiff's (First Amended) Complaint

made sufficient allegations given this standard,

## C. Relevant Evidence

In considering the document requests at issue in light of the claims, I note that evidence will be relevant should it do one of the following:[2] make more or less probable the existence of Defendant's knowledge of falsity, or reckless disregard for the truth; and/or (2) make more or less probable the truth of the report or its reasonable implications.

## II. Plaintiff's Motion to Compel–Relevance

### A. Material Regarding IBM

█ There are two arguments Plaintiff advances about the IBM materials and their relevance to the case. First, Compuware argues that having the same analysts produce ratings of IBM and Compuware created a conflict of interest that in and of itself constituted a breach of the contract by violating the implied covenant of good faith and fair dealing. (First Amended Compl. ¶ 11–12.) As discussed above, because the actual malice standard of First Amendment jurisprudence applies to the breach of contract claim here, such an argument must fail-the fact that the same individuals may have rated both IBM and Compuware is not a *per se* demonstration of actual malice.

However, Plaintiff's Complaint also appears to imply that because the rating in dispute discussed the litigation between Compuware and IBM and its potential effect on Compuware, and because Moody's was paid by both companies to produce ratings, Plaintiff's Complaint can be read to argue that the relationship Moody's had with IBM potentially improperly influenced the rating of Compuware in dispute. (*See* First Amended Compl. ¶ 19.) Because a demonstration of improper influence or the lack thereof would make more or less likely a showing of reckless disregard for the truth, such evidence is relevant to the claim. Therefore, the relevance of the IBM materials will be analyzed in that light.

### 1. Request One[3]: Documents Regarding Defendant's Credit Rating of IBM

█ This request is clearly overbroad given the allegations in the Complaint. First, because the rating of Compuware in dispute was issued on 13 August 2002, only those documents prepared before that time could have been reasonably considered by Moody's in preparing its ratings, and therefore only documents prepared before that time could inform this Court about whether Defendant acted with reckless disregard of what was known at the time. Documents prepared after 13 August 2002 would only be relevant if they contained information about how Moody's reached its conclusions expressed in the 13 August 2002 rating of Compuware, particularly the evaluation of the impact of the IBM/Compuware litigation. To the extent that the document request reaches IBM-related materials that were prepared after 13 August 2002 and do not discuss the 13 August 2002 rating, Plaintiff's motion to compel is DENIED.

### 2. Requests Six Through Eight[4]: Communications and Agreements Between IBM and Defendant

In order to support its theory of improper influence on the Compuware rating because

and the Complaint also stated a claim as to the defamation count, I denied the motion to dismiss these two claims on 16 July, 2003.

2. This is not an exclusive list of what propositions evidence must speak to in order to be relevant; rather, given the materials in dispute, these are the key considerations when examining these discovery requests for relevance.

3. Request One reads: "Any and all documents of any kind, including, but not limited to, notes, memoranda, emails, analyses, forms, calculations, rating committee minutes, and the complete files of John D. Moore, Richard J. Lane, Robert Konefal and Devon Shaw that in any way discuss and/or refer to credit ratings for any of the following entities for the last five (5) years":
   (a) Plaintiff Compuware Corporation
   (b) International Business Machines Corporation (IBM);
   (c) Computer Associates, Inc.

4. Request Six reads: "Any and all documents reflecting communications with IBM, and/or representatives and/or attorneys for IBM, including, but not limited to, correspondence, memos, notes and emails for the last five (5) years."

   Request Seven reads: "Any and all contractual agreements between Defendant and IBM for the last five (5) years."

of the business relationship between Defendant and IBM, it would be necessary to establish both that the relationship existed and that it was profitable for Defendant both before and after the rating of Compuware. Therefore, the materials requested in items Seven and Eight, which deal with those agreements and payments, are relevant.

■ Request Six, however, presents more of a problem. In order for Moody's to have been improperly influenced in making the rating, any such communication would need to have taken place before the rating was complete. Therefore, materials dated on or before 13 August 2002 would be potentially relevant. However, for materials that were produced after that date, only communications that refer to the Compuware rating on 13 August 2002 would be relevant. Therefore, to the extent Request Six seeks documents relating to IBM that were prepared after 13 August 2002 and do not refer to the Rating Action at issue, plaintiff's motion to compel is DENIED.

### 3. Request Nine [5]: Identity of IBM analysts

The identities of the persons who performed the IBM ratings are relevant, because the individuals who performed IBM's ratings would be the individuals most likely to have information about any improper influence.

### B. Material Regarding Computer Associates

Intervenor Computer Associates is a competitor of Plaintiff mentioned in the rating in dispute. Specifically, the Rating Action said: "In Moody's view, software competitive pressure continues to come from IBM, as well as from larger independent software vendors such as Computer Associates [...]." (Def.'s Br. in Opposition to Pl.'s Mt. to Compel, Ex. C.) The Rating Action then said that Moody's

expected the "competitive rivalry to remain intensified." (Id.)

Plaintiff's complaint does not mention Intervenor except in paragraphs 54 and 55. In those paragraphs, Plaintiff argues that because Intervenor had a higher rating than did Plaintiff following the disputed rating's publication, Defendant was representing that Plaintiff's creditworthiness was less than that of Computer Associates. (First Amended Compl. ¶ 55.) At the time, Intervenor allegedly had $1.3 billion in debt and its accounting procedures were under investigation by the Securities and Exchange Commission and the U.S. Department of Justice. (Id. at ¶ 54.) Thus, the argument for relevance of any material regarding Computer Associates is apparently a relative one: namely, that examination of the methods, data, assumptions, etc. used in rating Computer Associates will show, by comparison, that Defendant made false statements and recklessly disregarded the truth when rating Compuware. Plaintiff seeks all documents regarding Defendant's rating of Intervenor and the identities of the analysts who worked on the Computer Associates rating.[6]

■ Because Computer Associates is mentioned as a competitor in the disputed rating, those documents (if any) that directly compare the two companies for their ability to compete in the same market in the time frame discussed by the rating are relevant. Similarly, the identities of those individuals who rated Computer Associates is relevant, for the limited purpose of assessing whether there was a reckless disregard of the truth (that in essence constitutes a breach of the implied covenant of good faith) in making the statements about the competitive ability of Computer Associates and Compuware that informed the rating of 13 August 2002.

■ However, Plaintiff's argument that because of the relativistic comparison that is implied by rankings, all documents relating to Computer Associates' ranking are relevant

Request Eight reads: "Any and all invoices to IBM for the last five (5) years."

**5.** Request Nine reads: "Sufficient documents to identify the members of any rating committees that considered ratings for IBM, Compuware

and Computer Associates for the last five (5) years."

**6.** For the texts of Document Requests One and Nine, see footnotes three and five, respectively.

in this case must fail. Accepting such an argument would necessarily mean that all ratings of any company, or at least any company that is in more or less the same field, whether it is prepared by Moody's or Moody's competitors, would also be relevant in this action. Such a broad definition of relevance is untenable. Even if those items were relevant, because I feel the burden of the proposed discovery vastly outweighs its likely benefit, I would be obliged under Fed. R.Civ.P. 26(b)(2) to deny Plaintiff's motion for such materials. Therefore, to the extent that Request One seeks materials that do not discuss the competition between Compuware and Computer Associates during the time period assessed by the rating in dispute, Plaintiff's motion to compel is DENIED.

### C. Materials Regarding Compuware

■ Defendant did not object to producing all materials regarding Compuware's rating made in request one. Therefore, the only dispute about materials regarding Compuware is Request 10,[7] which seeks complete personnel files for four analysts who worked on the rating in dispute. To the extent that the personnel files discuss the disputed rating, they are clearly relevant. In addition, to the extent that the personnel files contain general statements about either habitual recklessness or misrepresentation (or alternatively, diligence or truthfulness), such information would be relevant. However, other information that may be contained in complete personnel files would not be relevant. Therefore, to the extent that Request Ten seeks information that does not mention the rating in question or the general habits described above, Plaintiff's motion to compel is DENIED.

7. Request Ten reads: "The complete personnel files of John D. Moore, Richard J. Lane, Robert Konefal and Devon Shaw including any performance plans and performance evaluations."

8. In *Sutherland,* the Michigan Supreme Court said that "all the modern approaches to conflicts of law are relatively uniform in the results they produce," and chose the two-factor test described above to decide which law should apply. 562 N.W.2d at 469. However, that case did not specifically discuss *Chrysler* and left unresolved

### III. Plaintiff's Motion to Compel—Reporter's Privilege Claim

Defendant's Brief in Opposition to Plaintiff's Motion to Compel Discovery invoked either Michigan's or New York's privilege for journalists to protect from discovery materials regarding IBM or Computer Associates. Because I find some of the material regarding these two companies is relevant, this Court must determine which state's law properly applies, and then assess the requested, relevant material in light of the extent of the privilege to determine whether it is discoverable. I will address these issues in turn.

### A. Choice of Law Analysis

[12] A federal court sitting in diversity must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Cole v. Mileti,* 133 F.3d 433 (6th Cir.1998). In this case, Plaintiff brings both a contract claim and a tort claim. In a contract case, the Michigan Supreme Court endorsed the use of the Restatement (Second) approach to the resolution of conflicts of law. *Chrysler Corp. v. Skyline Services Inc.,* 448 Mich. 113, 528 N.W.2d 698 (1995), cited for this proposition by *Meijer, Inc. v. General Star Indemnity Co.,* 61 F.3d 903 (unpublished) (6th Cir.1995). However, in 1997, in a discussion of conflict of law rules in a tort context, the Michigan Supreme Court laid out a two-step analytic framework: first, determine if any foreign state has an interest in having its law applied, and assuming that there is an interest, determine if Michigan's interest mandates that Michigan law be applied, despite the foreign interest.[8] *Sutherland v. Kennington Truck Service, Ltd.,* 454 Mich. 274, 562 N.W.2d 466 (Mich.1997). Because both

the question of whether Michigan courts are to apply the two different modern approaches in contract and tort cases, or whether the "relative uniform[ity]" of the results of the approaches means that all cases should proceed using the *Sutherland* factors. Therefore, I have chosen to work through both frameworks here, which, if nothing else, provides some evidence for the theory that these two modern approaches are likely to produce the same result.

frameworks lead to the conclusion that New York law should apply, it is unnecessary to decide which claim predominates in this case and therefore which of these two standards should be applied.

### 1. Second Restatement

Section 139 of the Second Restatement governs privileged communications. In order to select a state's law under that guidance, it is first necessary to determine which state "has the most significant relationship with the communication." *Id.* In this case, both IBM and Compuware are New York corporations, and they supplied the documents at issue to Moody's, which is also a New York corporation. Given the weight of these connections with New York, it seems clear that New York has the most significant relationship with the documents.

The second step under the Second Restatement is to determine if the materials are privileged under New York law. The New York Reporter's Privilege Statute protects any employee of a "professional medium of communicating news to the public" from any requirement to disclose any "news obtained or received in confidence." New York Civil Rights Law § 79–h(b). When the material requested is nonconfidential, the same protection applies unless the party seeking the disclosure can make "a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source." New York Civil Rights Law § 79–h(c). "News" is defined as "information or communication concerning [. . .] matters of public concern." New York Civil Rights Law § 79–h(a)(8).

The Southern District of New York has held that Standard and Poor's, a competitor of Moody's, qualified for reporter's privilege. *In re Pan Am Corp.,* 161 B.R. 577, 580–82 (1993). The Tenth Circuit and a California court have held that Moody's publishes matters of public concern (a key finding under New York law), which seems a correct holding given the importance of these ratings in the financial industry and therefore to inves-

tors at large. *Jefferson County School District v. Moody's Investor's Services, Inc.,* 175 F.3d 848 (10th Cir.1999); *see also County of Orange v. McGraw Hill Companies, Inc.,* 245 B.R. 151, 154 (C.D.Cal.1999).

▇ However, Compuware argues that the Second Circuit's decision in *In re Fitch* means that Moody's is not entitled to protection under the New York statute, or at least makes the question unclear. 330 F.3d 104 (2003). I disagree. Fitch, which was a third party to the underlying suit, is a financial ratings agency that refused to comply, on reporter's privilege grounds, with a subpoena requiring it to turn over information about the structuring of a deal. Because Fitch did not rate companies unless paid to do so by those companies (which the court distinguished from the practice at Standard and Poor's, where they would rate both clients and non-clients), and because Fitch played an active role in structuring the deal in question, the Second Circuit held that it was not engaged in activities that qualified for protection under the New York statute. 330 F.3d. at 110. Unlike Fitch, Moody's issues ratings even when not requested to do so. *See, e.g., Jefferson County School District v. Moody's Investor's Services, Inc.,* 175 F.3d 848 (10th Cir.1999) (tort suit based on a rating of the plaintiff that Moody's undertook although the plaintiff had not requested such a rating be done). Moreover, Compuware has not alleged that Moody's was so involved with the companies here that it stepped outside newsgathering activities. Therefore, under New York law, Moody's qualifies to assert reporter's privilege for the documents at issue here.

Given that the material in question here is privileged under the law of the state with the most substantial connection (New York) to it, the Second Restatement then requires a determination of whether it would be privileged under the local law of the forum. Although Michigan does have a reporter's privilege statute, M.C.L. § 767.5a(1), Plaintiff argues that the statute is not properly applied to civil cases. As discussed below, Plaintiff is correct; the only reporter's privilege in civil cases under Michigan law appears to come from the First Amendment.

M.C.L. § 767.5a(1) is part of the Michigan code of criminal procedure. The text of the bill itself indicated this. (Pl's Br. Concerning Choice of Law Issues, Apx. B.) Moreover, the House Legislative Analysis Section's Second Analysis of the bill concluded "[t]he bill should clarify that the press shield privilege is to apply in *any criminal proceeding*" and otherwise noted that one of the objections to the bill was that it should clarify whether the privilege applied in civil suits. (Id., emphasis mine)

I can find no civil case in which the Michigan courts have applied M.C.L. § 767.5a(1); instead, all decisions in civil cases in the Michigan court system analyze the First Amendment's more limited reporter's privilege as the basis for any claims. The case most cited for the application of the reporter's privilege in a civil case under Michigan law is *King v. Photo Marketing Assoc. Int'l*, 120 Mich.App. 527, 327 N.W.2d 515 (1983). *See, e.g.*, Scott A. Mertens, "Michigan's Shield Laws—A Free or Fettered Press?", *Thomas M. Cooley Law Review*, 16 T.M.Cool. L.Rev. 511 (1999). However, *King* only discussed privilege provided by the First Amendment and never cited any statutory basis for its decision. A Michigan state administrative commission, which also took up the question of the reporter's privilege in civil cases, did cite both the *King* case and M.C.L. § 767.5(a) for the proposition that the privilege in civil proceedings was identical to that in criminal proceedings. However, instead of applying the absolute privilege of § 767.5(a) that exists when life imprisonment is not a potential consequence, the State Tenure Commission used the First Amendment based analysis of *King* and found the privilege to be a qualified one.

In 1990, the Michigan Court of Appeals again took up the question of reporter's privilege in a civil case, and used a First Amendment rationale for much of the opinion, finding that there was no protection under Michigan law for non-confidential materials in a civil case. *Marketos v. American Employers Ins. Co.*, 185 Mich.App. 179, 460 N.W.2d 272, 281 (1990). At the finish of the opinion, the court did include a section on Michigan's Press Shield Law, and found that "the Michigan press shield law is inapplicable and provides no protection for a request in a civil case for nonconfidential materials." *Id.*, 460 N.W.2d at 281. However, that opinion did not specifically address why the press shield law was inapplicable in that case. In other words, the Michigan Court of Appeals did not say whether the statute did not apply because non-confidential materials are not covered by the statute, or because the statute cannot apply to civil cases at all.

The only decision I can locate that plainly applies the Michigan statute in civil cases is a federal court decision written by Magistrate Judge Whalen. *In re DaimlerChrysler*, 216 F.R.D. 395 (E.D.Mich.2003). That case did not discuss the legislative history of the statute or otherwise discuss the argument that the statute only applied in criminal cases. *Id.* Moreover, *In re DaimlerChrysler* also applied the common law (First Amendment based) reporter's privilege to the discovery matters discussed in that opinion as an independent and sufficient basis for the decision in that case. *Id.* at 406, n. 19.

■ Therefore, given the legislative history of the Michigan reporter's privilege statute, its placement as part of the Code of Criminal Procedure, and the fact that no Michigan court has applied the statute in a civil context to support the existence of that privilege, I believe that any privilege for the materials in question here must come from the First Amendment and not Michigan's statutory law.

The First Amendment privilege provided by Michigan law for confidential materials is a qualified one. *King, supra*, 120 Mich.App. at 530–31, 327 N.W.2d 515. The privilege provided by the New York statute for confidential materials, by contrast, is absolute. For non-confidential materials, regardless of whether the Michigan statute is applied or the First Amendment privilege applied, there is no privilege under Michigan law. Because New York provides a qualified privilege for those materials, a true conflict of laws exists for all materials, confidential and non-confidential, at issue here. Because I have determined that the privileges differ, the final step in the choice of law analysis under the Sec-

ond Restatement is to determine whether "there is some special reason why the forum policy favoring admission should not be given effect." § 139(2).

■ Here, there is a special reason. New York is the center of the financial publishing industry, and the New York companies who gave these materials to Moody's, also a New York company, surely relied on the protections of New York law. A willingness to provide materials that contain sensitive financial information to a financial rating service is key to the functioning of the ratings system (and its reliability). Therefore, the special protections afforded by the New York reporter's privilege statute facilitate an important public purpose from which investors all over the world (and in Michigan) benefit. Moreover, here, a Michigan company is requesting those materials as part of a suit against the publisher that does not arise out of contacts with the Michigan company, but rather contacts of New York corporations with each other. Therefore, the companies justifiably relied on New York law in their transactions. To apply Michigan law now to subject those materials to disclosure would not be in the interests of justice or fairness. Therefore, under the Second Restatement, New York's statute would apply in this case.

### 2. *Sutherland* factors

■ In a tort action, the Michigan Supreme court held that Michigan's choice-of-law principles provided that Michigan law would be applied unless a rational reason to do otherwise exists. *Sutherland v. Kennington Truck Service, Inc.*, 454 Mich. 274, 562 N.W.2d 466 (1997). In order to determine if such a rational reason exists, the court laid out a two-step analysis: (1) determine if any foreign state has an interest in having its law applied; and (2) assuming such an interest exists, determine if Michigan's interests mandate that Michigan law be applied despite those interests.

■ As discussed in the Second Restatement analysis above, in this case, New York has a very strong interest in having its law applied, since the materials in question were given by two New York companies to defen-dant Moody's, also a New York company. Moreover, in order for the reporter's privilege law to have the desired effect of allowing newsgatherers to seek information without fear of court-ordered production of those documents (and hence, the effect of making sources more willing to speak to the press), all courts must respect that privilege. A single court choosing to order disclosure of documents that would otherwise be privileged could greatly diminish the effectiveness of the protection, given that many New York publishers have a wide national circulation and would be subject to the jurisdiction of courts in a variety of states.

Moreover, Michigan has only a very slight interest in having its law applied in this case. Michigan's only connection to the documents in question is Plaintiff's discovery requests. While some of these documents are potentially relevant to the case at bar, the case at bar revolves around the publication of a rating that did not cite any of these documents. Therefore, given New York's very strong interest in having its privilege law apply, and given Michigan's much lesser interest, under the *Sutherland* analysis, New York privilege law would apply.

### B. New York Reporter's Privilege Statute

■ In determining whether material is confidential or nonconfidential, and therefore whether it has absolute privilege or qualified privilege, the question under New York law is whether there has been an implied or express agreement of confidentiality. *Hennigan v. Buffalo Courier Exp. Co., Inc.*, 85 A.D.2d 924, 446 N.Y.S.2d 767 (4 Dept.1981); *People v. Korkala*, 99 A.D.2d 161, 472 N.Y.S.2d 310 (1 Dept.1984). Where a document is received under conditions of confidentiality, an absolute privilege applies. New York Civil Rights Law § 79–h (b). Where a document is received without such conditions (i.e., is nonconfidential), the statute provides for a qualified privilege that can be overcome upon a showing that the information "(i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim; (iii) is not obtainable from

any alternative source." New York Civil Rights Law § 79–h (c).

Therefore, it will be necessary, if Moody's wishes to assert privilege for the materials requested that I have found are relevant, for it to prepare a list for *in camera* review of all otherwise discoverable (i.e. relevant) documents and the conditions of confidentiality under which they were received. The list should be divided into documents received under conditions of confidentiality and those without such conditions. For confidential documents, the list should contain a brief description of the document (for the sole purpose of identifying the document) and a detailed description of the conditions of confidentiality under which it was received. For those documents not received under conditions of confidentiality, the list should contain a detailed description of the document which specifies all information contained in the document and identifies any other potential sources for the same information. This Court will then have enough information to decide what privilege applies to what document and complete its decision on Plaintiff's motion to compel for Requests One, Six, Seven, and Eight. The list will be due in my chambers one month from the date of filing of this opinion, or, should that date fall on a weekend or court holiday, the first business day following that date.

## IV. Plaintiff's Motion to Compel: Personnel Records and Privacy Balancing

Moody's argues that the Request for the personnel records of its four analysts should be denied because the likelihood of discovering relevant information in those files is outweighed by those employees' privacy interests. *See, e.g., Ellman v. Hentges,* 2001 WL 649508 (N.D.Ill. June 8, 2001) (denying a discovery request for personnel files in a defamation case on the grounds that this was a "fishing expedition" when plaintiff wished to establish a history of defamation). The Sixth Circuit has recognized a privacy interest in personnel files, but has not always protected them from disclosure in discovery. *Knoll v. American Telephone and Telegraph,*

176 F.3d 359, 365 (6th Cir.1999); *Burzynski v. Cohen,* 264 F.3d 611 (6th Cir.2001).

Weighing issues of relevance against those privacy interests in a case analogous to this one, the Southern District of New York held that "[a] firm's personnel files containing confidential evaluations of employees is not discoverable when the issue is whether the firm conducted an audit properly." *New York Stock Exchange, Inc. v. Sloan, Jr.,* Fed. Sec. L. Rep. p. 95,774, 1976 WL 837 (S.D. New York 1976). It based this conclusion on an application of the following test: disclosure of confidential information should not be ordered unless (1) clearly relevant and (2) a compelling need exists. *Id.*

Plaintiff cites *Sabratek Liquidating, LLC v. KPMG, LLP,* a breach of contract and negligence action against KPMG, in which its former customer Sabratek sought and was granted production of the personnel files for those employees who had worked on its account. No. 01 C 9582, 2002 WL 31520993 (N.D.Ill. Nov.13 2002). The court based its ruling on the fact that Illinois law did not create a privilege for these records. *Id.* Michigan law does recognize a privacy interest in personnel files. By statute, Michigan protects personnel records of medical professionals from court subpoena. M.C.L. § 333.21515. In *Michigan v. Bey,* an unpublished opinion, the Michigan Court of Appeals upheld the denial of an order to produce personnel files in discovery because the court was not provided with "demonstrable facts indicating that there was a reasonable probability that the files were likely to contain material information." No. 204647, 1999 WL 33445258 (Mich.App. May 7, 1999).

Because both New York and Michigan courts have placed a high bar for the production of personnel files, and because I find the analysis of the Southern District of New York in the *Sloan* case persuasive, I find that the personnel records are not discoverable. Plaintiff's motion to compel is therefore DENIED as to Request 10.

## V. Plaintiff's Motion to Compel—Summary

To the extent that Request One (b) reaches IBM-related materials that were prepared

after 13 August 2002 and do not discuss the 13 August 2002 rating, Plaintiff's motion to compel is DENIED. To the extent that Request One (c) seeks materials that do not discuss the competition between Compuware and Computer Associates during the time period assessed by the rating in dispute, Plaintiff's motion to compel is DENIED. To the extent Request Six seeks documents relating to IBM that were prepared after 13 August 2002 and do not refer to the ratings downgrade at issue, Plaintiff's motion to compel is DENIED. Plaintiff's motion to compel is GRANTED as to request number 9. Plaintiff's motion to compel is DENIED as to Request 10.

All remaining questions on Plaintiff's motion to compel as to Requests One, Six, Seven, and Eight are HELD IN ABEYANCE pending production by Defendant of the additional materials needed to determine if the claims of privilege do in fact protect the requested documents. The list, for review *in camera*, is due in my chambers one month from the date of filing of this opinion, or, should that date fall on a weekend or court holiday, the first business day following that date.

## VI. Defendant's Motion to Compel

Compuware objects to nine document requests that Moody's makes (Requests One and Three though Ten). I will address the dispute related to Request One first. Because the issues raised in respect to requests Three and Five are similar, I will discuss those Requests together. Finally, I will address the requests related to the IBM/Compuware litigation (Requests Four and Six through Ten) together.

**9.** Request One reads: "All documents constituting, reflecting, referring or relating to any and all direct or indirect financial obligations of Compuware in existence at any time during the period between January 1, 2002 and August 18, 2002, including but not limited to, rental agreements, capital leases, operating leases, equipment leases, loans, debts, mortgages, contractual guarantees, and any off-balance-sheet arrangements."

**10.** Request Three reads: "All documents constituting, reflecting, referring or relating to communications between Compuware and any firm engaged to provide accounting or auditing services to Compuware relating to any aspect of Compuware's financial condition and/or its financial

### A. Document Request One [9]—Compuware's Direct and Indirect Obligations

A decision on this document request is currently not ripe. Compuware states in its brief that it "does not object to producing the items specifically identified if that is all Defendant wants." However, it appears not to have produced those documents to date (and objected to the request because it was unduly burdensome in its original reply to the requests). Therefore, plaintiff should be ordered to produce all the specifically identified documents, and at that time, if Moody's objects to the production as insufficient, this Court can then evaluate whether Plaintiff has complied with the request as required by the rules of civil procedure.

### B. Requests Three [10] and Five [11]—Compuware's Financial Condition

Compuware objects to the these two requests, both of which deal with Compuware's financial condition, on the basis of relevance, overbreadth and ambiguity. Plaintiff argues the requests could be construed to mean every piece of paper generated by the company. Compuware offers to submit its internal quarterly forecasts for the relevant time period (subject to a protective seal) to satisfy Request Three. Moody's argues that because Compuware's complaint alleges that Moody's misrepresented Compuware's financial condition, Plaintiff should be required to produce all requested documents.

Compuware's (First Amended) Complaint constrains the grounds on which it claims Moody's evaluation was grossly incompetent

statements during the two-year period ending August 18, 2002, including but not limited to all drafts of any financial statements or filings."

**11.** Request Five reads: "To the extent not included above, all documents, for a one-year period prior to August 18, 2002, including but not limited to internal memoranda and internal e-mails, referring or relating to any aspect of Compuware's financial condition at the time and/or projections, predictions, forecasts, or other references to or comments upon any aspect of Compuware's contemplated or possible future financial condition."

and/or defamatory. Paragraph 22, which deals with the breach of contract claim, states that "Moody's failure to take into account the total amount of cash and liquid investments available to Compuware to pay a credit facility while establishing a credit rating for that credit facility shows gross incompetence [...]." In paragraph 26, the complaint alleges that Moody's further breached the contract by refusing to discuss the IBM litigation with Compuware. Therefore, the only financial information relevant to the contract claim is the total amount of cash available to Compuware at that time.

The defamation count appears to rest entirely on allegations that Moody's implied Compuware had unfunded debt (debt that is due to mature in less than one year) when it in fact did not. Because of this alleged misrepresentation, Compuware says that the rating misrepresented Compuware's "true financial situation." (First Amended Complaint, ¶ 51.) That misrepresentation further affected Compuware's rating relative to that of competitor Computer Associates, the Complaint goes on to allege. (*See, e.g.*, id. at 55.) Therefore, the central issue, and in fact the only statements that Compuware alleges with any specificity were misrepresentations, deal with Compuware's unfunded debt. On that basis, to be relevant to the defamation claim, documents must pertain to the amount of unfunded debt.

■ Therefore, to the extent that Compuware has information that offers information about either (1) unfunded debt or (2) the cash available to Compuware to pay a credit facility at the time of the rating, these are relevant. Defendant's motion to compel for these materials is therefore GRANTED. However, documents that address Compuware's financial dealings that do not deal with either of these two issues are not relevant and therefore are not discoverable. To the extent Defendant requests such documents, its motion is DENIED.

## C. Requests Four [12] and Six Through Ten—Materials Regarding IBM

■ These Requests concern Compuware's relationship and litigation with IBM. Because Moody's lower rating was based in part on the impact of the litigation Plaintiff initiated with IBM, this material is relevant, since these materials could very well contain information that is informative about whether Moody's performed its rating reasonably. Compuware argues that all of the documents requested by Moody's have been produced in litigation between IBM and Compuware, and argues that protective orders entered in that case apply to these materials. Therefore, Compuware argues that a modification of those orders must be made, and then Defendant will have access to the documents at the place they are available to parties in the other litigation. Although this argument does apply to Requests Seven, Eight, and Nine (which request court materials including pleadings and depositions taken in the IBM case), as regards Requests Four and to a lesser extent Request Six (which requests documents Compuware generated), this argument has no merit. Those documents that Compuware generated about IBM are independently discoverable in this action. However, only those documents in existence at the time of the rating would be relevant; the assessment of the impact of the case must be judged given what existed then to determine whether it was reasonable. Therefore, to the extent the document requests seek documents in the IBM litigation that Compuware generated up to the date that the rating was issued, Defendant's motion to compel is GRANTED.

However, Compuware cannot be required to turn over documents it obtained or generated through discovery in the IBM litigation before the date of the rating without a modification of those protective orders in that case, since that would be tantamount to ordering them to violate the orders of that court. Therefore, I order Compuware to seek modification of the protective order in the Compuware/IBM litigation in order to

---

**12.** Request Four reads: "All documents, including but not limited to internal memoranda, internal e-mails, and correspondence with [IBM] or any other entity or person, referring or relating to actual or potential effects on Compuware's business of any past, present, future, or contemplated conduct by IBM."

provide Moody's access to the documents it seeks under the appropriate restrictions.

See also 2001 WL 1902806.

### D. Defendant's Motion to Compel: Summary of Rulings

Because the dispute over Request One is not ripe, I DENY Defendant's motion as to that Request without prejudice. Defendant's motion is GRANTED in part and DENIED in part as to Requests Three and Five. Plaintiff is ordered to seek a modification of the protective orders in its litigation with IBM and to produce materials that it generated to fulfill Requests Four and Six through Ten.

**IT IS SO ORDERED.**

