OPINION OF THE COURT
Frank J. LaBuda, J.
As the jury trial of People v Novak progressed through its full fifth week of trial testimony, the People served the Middletown Times Herald-Record newspaper with a subpoena duces tecum, seeking to compel testimony from Victor Whitman, a reporter for the Times Herald-Record (hereinafter referred to as the Record), and production of all unpublished audio and video recordings and reporter’s notes created during an August 2, 2013, interview of defendant, Paul Novak, by a Record reporter while on assignment for the newspaper. The interview took place at the request of defendant at the Sullivan County Jail. The Times Herald-Record has filed a motion to quash the subpoena. NBC Universal has joined in that motion and submitted supplemental papers. The court heard oral argument on September 11, 2013.[1]
The indictment before the jury charges the defendant, Paul Novak, for the murder of his estranged wife, arson in connection with the burning of the marital residence, burglary, grand larceny and insurance fraud. Jury selection for this trial began on August 5, 2013. At some point prior to jury selection, defendant sought out and gave an interview to the reporter for the Record who has been reporting on this case for some time.[2] That interview occurred on August 2, 2013. The Times Herald-Record ran a front-page story about the defendant and on the *751 interview in the August 4, 2013, Sunday edition of the paper. It also posted a “portion” of the video recorded interview on its website on August 4, 2013. The running of the story and posting of the interview detrimentally affected the jury pool, but the parties were eventually able to seat 12 jurors and eight alternate jurors. Opening statements and testimony commenced the following week, on August 12, 2013.
The People argue that they need the recordings and notes of the reporter for proper examination of defense witnesses and defendant, should he take the stand and testify. They argue that the recordings are not privileged, because defendant requested and arranged the interview, and portions have been published, thereby invalidating application of New York’s “Shield Law.” The Record and NBC Universal argue that the First Amendment constitutional reporter’s privilege applies to all information obtained by a journalist while gathering the news, regardless of whether the information is published or used to publish other news stories and regardless of whether the person requests the interview.
The history of New York’s Shield Law dates back to 1970. (Civil Rights Law § 79-h [c].) It has been amended in 1975,[3] 1981,[4]
[5]and 1990.[5] In its current version, it states in pertinent part,
“Qualified protection for nonconfidential news. Notwithstanding the provisions of any general or specific law to the contrary, no professional journalist .. . employed or otherwise associated with any newspaper . . . shall be adjudged in contempt by any court in connection with any civil or criminal proceeding . . . for refusing or failing to disclose any unpublished news obtained or prepared by a journalist ... in the course of gathering or obtaining news . . . where such news was not obtained or received in confidence, unless the party seeking such news has made a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party’s claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source. A court shall order disclosure only ... [if] *752 the above-described showing has been made and shall support such order with clear and specific findings made after a hearing.” (Civil Rights Law § 79-h [c].)
Case law has evolved over the decades in response to the legislative amendments. In the landmark case of Matter of Knight-Ridder Broadcasting v Greenberg (70 NY2d 151 [1987]), the Court of Appeals stated, “Consideration of all the circumstances surrounding the 1981 amendment to the Shield Law leads inexorably to the conclusion that the Legislature, by considering and rejecting an explicit provision addressing the issue facing the court today, did not intend the Shield Law to create an ‘absolute privilege’ against disclosure.” (Id. at 158.) In essence, the Court held that where portions of a recording have been broadcast, any claim of confidentiality with respect to such recording is destroyed, invalidating application of the Shield Law;[6] the Shield Law only protected news gathering materials that had been imparted to a reporter under a “cloak of confidentiality.”
Similarly, in People v Korkala (99 AD2d 161 [1st Dept 1984]), the First Department stated,
“[W]e are mindful of the fact that there is the qualified privilege accorded to the newsman which is founded directly upon the free speech, free press guarantees of the First Amendment and that compelling disclosure of information obtained by a reporter in news gathering can have a ‘ “chilling effect” upon his functioning as a reporter and upon the flow of information to the general public’ (see Loadholtz v Fields, 389 F Supp 1299, 1300). And this is so even though the ‘source’ of the sought-after material is already known. In Loadholtz v Fields (supra, p 1303), the court ruled that even though no confidential source issue was involved, that fact ‘is utterly irrelevant to the “chilling effect” that the enforcement of these subpoenas would have on the flow of information to the press and to the public. The compelled production of a reporter’s resource material is equally as invidious as the compelled disclosure of his confidential informants.’ ” (Id. at 166-167.)
“Although it seems clear that the unbroadcast ma *753 terial is ‘relevant’ to the subject of the prosecution and that these materials are not obtainable from any other source, it is by no means clear from this record that their production is ‘necessary’ to the Korkala prosecution, even for impeachment or rebuttal purposes.” (Id. at 168.)
There is a long line of cases post Knight-Ridder, however, delineating a constitutional privilege, as well as the Shield Law protections afforded to journalists. In 1988, the Court of Appeals established that a reporter’s constitutional privilege protects unpublished information obtained by a journalist in the course of gathering news. (O’Neill v Oakgrove Constr., 71 NY2d 521 [1988].)
“The autonomy of the press would be jeopardized if resort to its resource materials, by litigants seeking to utilize the newsgathering efforts of journalists for their private purposes, were routinely permitted. Moreover, because journalists typically gather information about accidents, crimes, and other matters of special interest that often give rise to litigation, attempts to obtain evidence by subjecting the press to discovery as a nonparty would be widespread if not restricted on a routine basis. The practical burdens on time and resources, as well as the consequent diversion of journalistic effort and disruption of newsgathering activity, would be particularly inimical to the vigor of a free press.” (Id. at 526-527 [citations omitted].)
The Court of Appeals, in Oakgrove, discussed the tripartite test used to determine whether a trial court could compel production of confidential information from a journalist. The Court stated that the party seeking production of the items sought must show: (1) that the information is highly material, (2) that the information or material is critical to the litigant’s claim, and (3) that the information and/or materials are not available elsewhere. (Id. at 527.) The Court further explained that “if the material sought is pertinent merely to an ancillary issue in the litigation, not essential to the maintenance of the litigant’s claim, or obtainable through an alternative source, disclosure may not be compelled.” (Id.) Furthermore, New York State Constitution, article I, § 8 indicates this privilege extends to all information obtained or otherwise generated in the course of news gathering, whether the information is confidential or non-confidential. (Id. at 524.) The qualified protection provided to *754 journalists is a mandate — not only in the First Amendment to the United States Constitution, but also of the New York State Constitution.
The People have argued that the Oakgrove decision is limited to civil matters and not applicable here. That argument, however, is not supported by a fair reading of the Court’s decision.
“To be sure, in some of the cases in which a constitutional reporter’s privilege [sic] was recognized, the countervailing government interest was not as compelling as the grand jury investigation in Branzburg v Hayes (408 US 665). Nevertheless, the courts have held the three-pronged test applicable regardless of the criminal or civil context.” (Id. at 528 n 2 [citations omitted].)
The tripartite test adopted in Oakgrove applies in criminal matters as well as civil matters. This does not mean a reporter’s privilege will never yield to a criminal defendant’s Sixth Amendment right under the United States Constitution, but to determine if it does, the court must engage in the tripartite test to make that determination. (See People v Troiano, 127 Misc 2d 738 [Suffolk County Ct 1985].)
The People’s reliance on Korkala is likewise misplaced. The First Department in Korkala decided whether the then (1981) current version of the Shield Law created an absolute privilege for nonconfidential, unpublished outtakes of a press interview of a criminal defendant. In that case, the prosecution, as in the instant case, claimed a need for the outtakes for use on cross-examination to impeach the defendant — to rebut a prospective defense through admissions the defendant made during the course of the interview. The Court indicated that the “cloak of confidentiality” requirement was still required under the 1981 amendments to the Shield Law and therefore determined there was no statutory protection for the subpoenaed outtakes. Regardless, the Korkala court recognized and applied the qualified constitutional privilege, and the decision has since had no precedential force and effect because of Oakgrove and the 1990 amendments to the Shield Law.
The People also rely on Matter of National Broadcasting Co. v People (238 AD2d 618 [2d Dept 1997]), a post-Oakgrove case, in which a reporter interviewed a murder defendant in a jail setting. Unlike the case at bar, however, the defendant in National Broadcasting confessed to the crime during the interview, and *755 that portion of the interview was broadcast on the news. Therefore, the Second Department held that the People satisfied the tripartite test by showing a factual predicate to support their claim that the subpoenaed materials might contain evidence by way of further admissions of guilt by the defendant.
In the case at bar, the People have not met their burden under the tripartite test in Oakgrove or Civil Rights Law § 79-h (c). The People have indicated they “need” the subject material, but have not shown the recording and notes are highly relevant and that the recording and notes are critical or necessary to the People’s case or proof of a material issue. They have failed to meet the first two prongs of the test. In their own argument, the People indicated they need the material because the defendant may testify. Whether the defendant testifies is speculative, and therefore, whether the recording and notes are highly material or relevant is also speculative, especially considering that during the recorded interview defendant consistently denied his involvement with the crime and stressed that he was innocent (unlike the defendant in National Broadcasting).
The People have not demonstrated how the recordings could be used to impeach the defendant herein, nor have they met the second prong of the test, which requires that the material is critical or necessary to the maintenance of their claim — that defendant murdered his wife. While this court takes note of the numerous cases cited by the People used to support their argument for compelled disclosure, the court finds the arguments too speculative, as all of the cases are factually inapposite to the case at bar, as defendant Novak proclaimed his innocence.
The case law on which the People rely is prior to the Oak-grove decision and the 1990 amendments to the Shield Law. The post-amendments and post-Oakgrove case on which the People rely are factually distinguishable from the case at bar, as defendant Novak did not confess to this crime during the interview with the reporter from the Times Herald-Record newspaper.
Thus, in the case at bar, the Novak “jail house” interview is protected constitutionally, statutorily and judicially. In holding so, this court confirms the basic right of free press, which guarantees to all of us, our right to be free citizens in a society of law, without fear of improper or overreaching government intrusions.
Based on the foregoing, it is therefore ordered that the motion to quash the subpoena is granted.

. Paul Novak was indicted on October 24, 2012 for the December 13, 2008, murder of his estranged wife, the arson of the marital residence, burglary, grand larceny, and insurance fraud. Although the case was closed by the New York State Police in 2009, the defendant was arrested in 2012, shortly after new “leads” were developed in early 2012 through the defendant’s estranged girlfriend, Michelle LaFranee.

. This wife murder/arson case received substantial media coverage from the date of defendant’s arrest in late 2012, and since the beginning of the trial, has received full daily coverage by newspaper, radio and television.

. L 1975, ch 316.

. L 1981, ch 468.

. Civil Rights Law § 79-h (c) became effective on November 1, 1990. (See L 1990, ch 33, § 3.)

. This is the position strenuously argued by the People in support of their affirmation in opposition to the motion to quash the subpoena.